**Dr. Pedro SILVA et al.,
Plaintiffs-Appellees,**

v.

**SECRETARY OF LABOR et al.,
Defendants-Appellants.**

**No. 74–1410.**

United States Court of Appeals,
First Circuit.

Argued March 6, 1975.

Decided June 10, 1975.

in favor of Miss Laurinda Pires, a citizen of Portugal, who has agreed to work as a live-in maid at the home of Dr. Pedro Silva in Springfield, Massachusetts. The court directed the Secretary to issue the certification.

Alien labor certification is provided for in section 212(a)(14) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(14). Aliens "seeking to enter the United States for the purpose of performing skilled or unskilled labor" comprise one of a number of categories *excluded* from admission,

> "unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed."

Dr. Silva, a gynecologist and obstetrician, sought to obtain certification for Miss Pires in the fall of 1972 by filing with the Massachusetts Division of Employment Security in Springfield the completed forms and back-up papers required under the Secretary's regulations. 29 C.F.R. § 60.2.[1] As we must decide in the course of this appeal whether or not the Secretary's denial was arbitrary or unlawful, we set forth in rather elaborate detail the information furnished therein and the proceedings generally as they appear in the record.

James P. Morris, Atty., Dept. of Justice, with whom John L. Murphy, Chief, Government Regulations Section, Crim. Div., Washington, D. C., James N. Gabriel, U. S. Atty., Boston, Mass., and Paul G. Gorman, Atty., Dept. of Justice, Washington, D. C., were on brief, for defendants-appellants.

S. Joseph Ciccia, Springfield, Mass., with whom Lawrence J. Kenney, Springfield, Mass., was on brief, for plaintiffs-appellees.

Before ALDRICH, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This is an appeal by the Government from an order of the district court setting aside the Secretary of Labor's refusal to issue an alien labor certification

---

1. The Secretary's regulations list certain skilled occupations as to which he has found an insufficient supply of U. S. workers and no adverse affect on wages and conditions of those similarly employed. 29 C.F.R. § 60.7, Schedule A. In Schedule B are listed other occupations found by the Secretary not to qualify for certification. Household Domestic Service Workers having less than one year of experience are listed in Schedule B. Because she had extensive experience, Miss Pires' eligibility was unaffected by Schedule B. No other public expressions of policy, in regulation form or otherwise, have been called to our attention, although at oral argument counsel for the Secretary seemed to indicate that the Secretary had a policy against admitting live-in domestics except, perhaps, in some exceptional circumstances.

A form entitled "Statement of Qualification of Alien", executed by Miss Pires, was submitted. She indicated that she had had 30 years experience as a maid, cook and domestic servant, and was seeking work as a "domestic." In a companion form, "Job Offer for Alien Employment," Dr. and Mrs. Silva attested that they would hire a qualified U.S. worker if one were available; that efforts had been made to fill the job through the "Unemployment Office, bulletins at three hospitals"; that the job to be performed was "House cleaning, cooking, mending, washing, ironing and occasional child care"; that the total number of hours per week was "40 hours" (the space for overtime was left blank); that "basic" and also "overtime" pay would be $2.00 per hour; that room and board would be provided and the employee would have a private room; and "some knowledge of Portuguese language is helpful."

In a third form entitled "Supplemental Statement for Live-at-work Job Offers," Dr. Silva indicated that his household contained two adults and three children, ages six to eleven, and that the alien would be paid $80.00 weekly, with $5 to be deducted weekly for 57 weeks in order to repay anticipated advances for visa, medical fees and travel from Portugal to Springfield. Dr. Silva reported that there had been no respondents to job advertisements he had placed at the hospitals. Under the question, "if alien will be required to give special care or attention to any persons, please explain," Dr. Silva replied "None."

Submitted with the forms was a copy of the employment contract signed by the Silvas and Miss Pires. Miss Pires was described as a "live-in domestic." Her workweek was to be 40 hours. The "exact hours of daily employment" were described as from 8 a. m. to 5 p. m. with one hour off for lunch Monday through Friday. The employee was to be "free to leave the premises of the employer at all other times except that she may work overtime paid at the hourly rate of $2.00 U.S. dollars." Further it was "under-stood that the employee will reside on the employer's premises," and no money was to be advanced "except if the employee needs the same."

Shortly after the above forms had been filed, the Manpower Administration in Boston asked the Silvas and state employment security officials for further information as to what had been done to locate legal resident workers for the job, especially day workers. The following were then submitted:

1. Form executed on behalf of the local Springfield office of the Massachusetts Division of Employment Security that the prevailing wage in that area for a Maid General (Dom. Ser.) was $2.00 per hour plus room and board, and that the regular and overtime wage Dr. Silva offered equalled the prevailing wage. The form included the statements, "We have been unable to refer any qualified applicants for live in domestic employment," and that "Workers are not available in this occupation (live in domestics)." The number of "active applications on file" was "21" [presumably meaning day worker applicants].

2. Statements under oath by Reverends George Farland and Edward Kennedy of the Sacred Heart Parish that they had attempted unsuccessfully to locate someone who would work for the Silvas as a live-in maid.

3. Statement under oath of Phyllis O'Brien, director of Social Services at Mercy Hospital, of unavailing efforts for a considerable period of time to find a live-in maid for the Silvas, "as most of the people were only available for part-time work and were not able to provide the range of services the doctor needed."

4. Affidavit of Dr. and Mrs. Silva attesting to unavailing efforts through employment agencies listed in the Yellow Pages of the phone book as well as through his parish and hospital to secure a live-in maid. Dr. Silva also replied to the few newspaper ads found in local newspapers, finding more often than not that they are "for part-time situations and by people more involved in cleaning

rather than cooking, etc." Dr. Silva went on to say,

"The reason why a day worker would not be suitable for this position is that as a doctor of Obstetrics and Gynecology, I am working long hours and irregular hours, and I am out of my home a great deal. My demands of my wife are great in terms of helping me in communications with patients in being in attendance at social functions, meetings, conferences and seminars out of the city and in addition to having an unusually large home which needs a lot of attention. She has also been doing some volunteer teaching. It is important that someone be physically present in our home with whom our children will be comfortable at meals and other times without their mother and father present. A person living in our home would also be more available for our irregular schedule and also for overtime in unusual time demanding situations. A special relationship through her physical presence with the children would facilitate keeping the children on a regular schedule. We have employed day workers from time to time and this has not proved successful at all in terms of availability and capability. . . ."

On December 14, 1972, the Secretary's certifying officer in Boston issued a form response to Dr. Silva, to the effect that the Secretary could not issue the certification required by section 212(a)(14) because

"Available job market information will not warrant a certification of unavailability of workers in the U.S."[2]

Dr. Silva promptly sought review of the decision, in accordance with the Sec-retary's procedures.[3] Dr. Silva's counsel, by letter dated February 14, 1973, listed as the grounds for review that all available information, from both private and public sources, continued to demonstrate the unavailability of persons who could be hired. Further, it was urged that Dr. Silva's and his wife's need was "compelling". Accompanying was a psychiatrist's letter to the effect that she had examined Mrs. Silva on February 14, and that Mrs. Silva had described complaints dating from June, 1972, involving "intermittent spells of severe anxiety, accompanied by nightmares, insomnia and severe irritability." Reference was made to weight loss and impulses to run away. These symptoms occurred exclusively at night, when Dr. Silva was out on call. Dr. Silva had attempted to cope by installing an expensive alarm system. The psychiatrist wrote that Mrs. Silva had been "chronically depressed by her geographic separation from her extended family", and recommended,

"a live-in companion . . . to protect this woman's mental health during her husband's frequent absences. In my opinion she suffers from severe and disabling anxiety neurosis which is exacerbated by her being left alone in the house."

Together with the psychiatrist's letter was an affidavit of Dr. Silva, relating that he had made continued, unavailing efforts to secure a worker, and that the Massachusetts Division of Employment Security had not produced any prospective workers even for interview. In addition, Dr. Silva said that the hours of his work caused him to be absent from home many hours during the evening and early morning, and that notwithstanding installation of an alarm, his wife's needs persisted.

---

**2.** At about the same time in a letter to Senator Edward W. Brooke, the Acting Regional Manpower Administrator wrote, in the same vein,

"On the basis of labor market information that legal resident domestic household service workers were available in the Springfield, Massachusetts, area, the certification required by Section 212(a)(14) . . . could not be issued."

**3.** A form attached to the certifying officer's determination provided information as to how to seek review. It advised that "any new or additional matters not previously considered" should be presented with the request for a formal review.

The denial for certification was thereafter reviewed by the Assistant Regional Manpower Administrator, see 29 C.F.R. § 60.4, who on March 26, 1973, notified Dr. Silva's attorney that, after review, he failed to find any grounds warranting reversal of the certifying officer's decision. He went on to state,

"The concerns raised by Dr. E. Deborah Gilman, M.D. [the psychiatrist] strongly limit any reasonable access to possibly qualified and available applicants from the resident U.S. labor force, under the job classification cited by your client (Domestic Live-in).

To the contrary, the duty requirements cited by Dr. Gilman to 'protect this woman's mental health' are above and beyond those normally expected for the occupational classification requested at the wage offered."

Upon receipt of this letter, Dr. Silva's attorney submitted a further letter from Dr. Gilman, to the effect that she never meant to say that Mrs. Silva was in need of any kind of professional or paraprofessional psychiatric nursing attention. Rather, given Dr. Silva's frequent and irregular absences from his home during the night, she needed a live-in servant to provide her "the reassurance that only another adult in the home can give." This, the psychiatrist stated, could be adequately fulfilled by a domestic servant.

On April 28, 1973, the reviewing officer wrote that he had again reviewed the case in light of the enclosure and found no grounds to reverse.

Thereafter appellees commenced suit in the district court, seeking a declaratory judgment and review under 28 U.S.C. § 2201 and section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 704–06. The thrust of the complaint was that given the abundant evidence that United States labor to fulfill the job require-

ments was unavailable, it was arbitrary for the Secretary to deny certification.

The Government moved to dismiss. It argued that the certification statute was not designed to protect potential employers but only the American labor market; therefore, it was claimed, Dr. Silva lacked standing. See *Braude v. Wirtz*, 350 F.2d 702, 706–08 (9th Cir. 1965). With this argument was coupled the argument that labor certification was non-reviewable as "agency action . . . committed to agency discretion by law. . . . " 5 U.S.C. § 701(a)(2).[4] Finally the Government argued that it was not an abuse of discretion for the Labor Department to determine that day workers could adequately fulfill the job requirements and were available in the Springfield area. The Government pointed to the 8 a. m. to 5 p. m. hours of employment listed in Silvas' contract with Miss Pires. It also urged that the purpose of the statute—to protect American workers—would be eroded by creating subclassifications within the domestic help category.

Plaintiffs, in turn, moved for summary judgment. The court then entered a Memorandum ruling that appellees had standing, and finding that the Secretary and Regional Manpower Administrator had been advised by the Massachusetts Division of Employment Security that its local Springfield office had not been able to refer qualified applicants for live-in domestic employment to plaintiffs, and that such live-in workers were not available. The court went on to say that while the Division of Employment Security advised that day workers were available for domestic work,

"Nothing in the administrative record . . . demonstrates that defendants had information from other sources of any worker to meet

---

**4.** The Immigration and Nationality Act does not establish any special procedure for review of certification decisions, nor does it preclude judicial review. The Government has not questioned standing and reviewability on appeal. The district court correctly ruled in appellees' favor on both scores. See *Digilab, Inc.*

*v. Secretary of Labor*, 495 F.2d 323 (1st Cir.), cert. denied, 419 U.S. 840, 95 S.Ct. 70, 42 L.Ed.2d 67 (1974); *Pesikoff v. Secretary of Labor*, 163 U.S.App.D.C. 197, 501 F.2d 757, cert. denied, 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974).

plaintiff Silva's job requirements. Nor does the record show any finding or determination by defendants of any workers 'able, willing, qualified, and available . . . at the place to which the alien is destined to perform . . .', within the meaning of 8 U.S.C. § 1182(a)(14). There are no facts set out in the administrative record that support the conclusory statement of reasons assigned for the decision that 'Available job market information will not warrant a certification of unavailability of workers at the place of intended employment, viz. Springfield.' "

The court thereupon remanded to defendants for the limited purpose of furnishing "a statement of the specific factual basis on which the decision rests." The court indicated that it was persuaded to adopt this course by our decision in *Digilab, Inc. v. Secretary of Labor,* 495 F.2d 323 (1st Cir.), *cert. denied,* 419 U.S. 840, 95 S.Ct. 70, 42 L.Ed.2d 67 (1974). *See also Bitang v. Regional Manpower Administration,* 351 F.Supp. 1342 (N.D.Ill.1972).

Eventually, after delay, a statement was produced (executed and one might suppose prepared by the local Assistant United States Attorney handling the case rather than by Labor Department officials). It recited that defendants "hereby furnish to the court a statement of the specific and factual basis supporting their decisions of December 11, 1972, March 26, 1973, and April 25, 1973." However, the contents of the statement added nothing to the existing record and were simply arguments for the result reached, to wit:

1. The live-in requirement was arbitrary and restrictive and intended to preclude legal residents from the offered employment. This was so because the contract was for daytime hours and the employee would be free to leave the premises (except for overtime). Thus day workers who were available could allegedly have performed the necessary services.

2. Referrals from the eligible pool of household day workers maintained by the Massachusetts Division of Employment Security were supposedly not sought.

3. The presence of another adult in the house to provide reassurance was not a reasonable basis for issuance of a labor certification because that consideration was not "related to the usual job duties performed by a Maid, General".

In an ensuing Memorandum and Order, the court found the Government's statement to be argumentative and unresponsive to its order requiring a statement of the specific factual basis "on which the decision rests." It was found not to furnish any factual data not already before the court. The court said that it would not remand a second time for a statement of facts, and would decide on the existing record. The court held that plaintiff's job specifications required more than merely 8:00 a. m. to 5:00 p. m. domestic work; they required also that the worker live in and perform some additional duties. According to the court,

"No such workers were available to perform such duties in Springfield, Massachusetts, according to the Massachusetts Division of Employment Security. Without any proof offered to the court, the defendants view the live-in requirement as 'arbitrary and restrictive and intended to preclude legal residents from the offered employment'. This is clearly an attack upon the good faith of the plaintiff's personnel requirements, an exercise in which the defendants have no right to engage absent proof . . .. Moreover, defendants have declared that the offered employment can fully be met by day domestic workers, and thus they seek to exercise the privilege of determining the qualifications for the job to be filled, a privilege which they do not possess."

The court concluded that the decisions of defendants were arbitrary, an abuse of discretion, and contrary to law. They were ordered set aside and plaintiffs' re-

quest for alien labor certification was remanded to defendants with directions to grant the same.

## I

The present case presents a question comparable to that in *Digilab, supra,* where the Secretary denied certification of an electrical engineer of very specialized skills sought by Digilab, on the ground that there were 200 unemployed engineers listed in a Registry maintained in California. *Id.,* 495 F.2d at 326. Judge Moore, writing for the court, agreed with the district court that a showing that there were numerous unemployed engineers did not indicate that there were other workers in the United States "able, willing, qualified, and available" to do the specialized work required.

■ In the present case the Secretary believes that the active applicant file of the Massachusetts Division of Employment Security, showing 21 persons registered in Springfield for housework of some variety, established that United States workers were available to perform Dr. Silva's work. Yet the Massachusetts Division asserted that none of these were available to live in. Moreover, it is not clear that any of the dayworkers would be available for fulltime work, or possessed the cooking or other skills sought. Miss Pires attested in her qualifications form to 30 years experience as maid, cook, and domestic servant. Details of her previous employments were provided, and her last employer certified that she was "a most reliable person and an excellent cook." There is no showing that comparable workers were available even by the day. Indeed, the only evidence in the record is to the contrary. Dr. Silva stated in his affidavit that when he followed up newspaper ads, he found that most people were interested in part-time work and in cleaning, not cooking. He said the Silvas had employed day workers from time to time and "this had not proved successful at all in terms of availability and capability." He spoke, more-

over, of a desire to find someone with whom the children will be "comfortable at meals and other times without their mother and father present." Thus the record is less than persuasive even as to the availability of day workers suited to the Silvas' needs.

■ The more basic question, however, is, assuming the availability of day household workers of some kind, whether the Secretary may for that reason refuse to certify an alien live-in domestic. It is undisputed that legal resident live-ins were unavailable. The Secretary argues that because Miss Pires' contract hours were to be from 8:00 a. m. to 5:00 p. m., and because she would be free to leave the premises at will, she would be no different from a day worker. This reasoning borders on the absurd. The contract requires Miss Pires to live on the premises and provides for overtime. Obviously there would be marked advantages and convenience to the Silvas from such a live-in arrangement. Anyone of advanced years or a mother with infant children and an absent husband appreciates the difference between a domestic worker who is frequently on the premises and one present only during regular working hours. Even if the live-in worker performs no actual overtime work (and of course her constant availability for that purpose is itself a decided benefit), her off-duty presence in the house is a reassurance in the event of illness or emergency.

It is true, of course, that a live-in employee may be more readily induced to provide extra work—such as baby sitting or answering the phone—for no extra pay; and the ever-present risk of exploitation may entitle the Secretary, as the protector of United States resident labor, to examine the position suspiciously. But these issues, further discussed below, are not the same as whether a live-in housekeeper-maid is the functional equivalent of a day worker.

In the present case, plaintiffs represented that Mrs. Silva was nervous and apprehensive during the frequent absences of her husband, a busy obstetri-

cian. The Secretary's attempt, without supporting evidence, to belittle these understandable assertions does not commend itself to us anymore than it did to the district court. Nor does the Secretary's studied effort to pretend that what the Silvas wanted was a psychiatric nurse. It is true that Mrs. Silva's nervousness was not brought to the fore until after the original adverse decision. Yet the Secretary's own instructions encourage the submission of additional evidence at the review stage. And the Silvas may well not have known how strong a showing of need was required. The Secretary's policies are not spelled out, and the applicant is not in a position to know in advance what drift his case may take. We do not think that the Secretary can summarily reject the Silvas' assertion, supported by a psychiatrist's letter and by the facts of Dr. Silva's job, that Mrs. Silva's nervousness was a factor in designing the job requirements. If not, it is obvious that a day worker cannot fulfill the Silvas' job requirements.

█ We thus agree with the district court that the certifying officer's laconic finding that there were United States workers available was arbitrary and, in fact, simply wrong. Part (A) of section 1182(a)(14) attaches to the concept of availability that the workers be "able," "willing" and "qualified." The record does not support a finding that the kind of domestic coverage desired by the Silvas was available in Springfield from local labor sources.

## II

The Secretary does not now seriously argue that the local labor market could fulfill the Silvas' requirements, especially with respect to companionship for Mrs. Silva during Dr. Silva's absences. Rather he argues that the latter function is an impermissible utilization of a domestic worker. Mrs. Silva must choose, it is said, between a day worker and being in such dire need as to hire a nurse attendant. By this logic, an 85-year old person in good health desirous of a live-in housekeeper as a reassurance in the event of sudden illness would have to choose between a day worker and an unwarranted, expensive, round-the-clock service. The logical intermediate choice of a live-in worker would be denied.

█ The District of Columbia Circuit recently supported the Secretary's right not to honor the full gamut of an employer's requirements. In *Pesikoff v. Secretary of Labor,* 163 U.S.App.D.C. 197, 501 F.2d 757, *cert. denied,* 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974), a case also involving a physician's request for live-in help (but without the added aspect of Mrs. Silva's disability and Dr. Silva's irregular hours), the court held that the Secretary could treat "Dr. Pesikoff's live-in requirement for his maid as a personal preference irrelevant to determination of whether there was . . . a pool of potential workers willing to perform the Pesikoff's domestic tasks." 501 F.2d at 762. The court reached this result (and its Orwellian designation of the employer's needs as irrelevant "personal preferences")[5] in light of its reading of the entire statute. It pointed out that prior to enactment of the 1965 Amendments to the Immigration and Nationality Act, section 212(a)(14) was structured to permit entry of aliens seeking to perform work in the United States unless the Secretary certified that there were sufficient American workers to perform the labor or that the employment of aliens would adversely affect the wages and working conditions of American workers. The 1965 Amendments reversed the language so as to create a presumption against entry. It follows that the burden is on the alien or his prospective employer to prove that it

5. Using denigrating language to transform an employer's reasonable requirements into something less seems to us unfair. It may be that to protect United States resident workers the Secretary is empowered to deny certification even where the alien labor would clearly prove more satisfactory from the employer's viewpoint. We would rather say so than belittle the employer's job description.

is not possible for the employer to find a qualified American worker.

This burden of proof, however, seems to us a different point from the Secretary's purported right to treat as irrelevant the employer's job preferences. That right, if it exists, would seem to rest not on part (A) of the statute (dealing with whether resident workers are available to perform the desired task) but on part (B), requiring the Secretary to find, as a further prerequisite to certification, no adverse effect on the wages and working conditions of the workers in the United States similarly employed. Conceivably the sheer administrative difficulty of making refined distinctions and the need to guard against cheating by employers, *Pesikoff, supra* at 763, coupled with the fact that more competent and more highly skilled aliens will threaten the job opportunities of marginally qualified Americans in similar if not identical employment, might lead the Secretary to refuse to certify live-in domestics even though available American day workers are demonstrably less satisfactory from the employer's viewpoint. *See The Elton Orchards, Inc. v. Brennan,* 508 F.2d 493 (1st Cir. 1974), *rev'g* 382 F.Supp. 1049 (D.N.H.1974). Were live-in domestic workers to be treated separately from day workers, the Secretary might fear such a steady influx as to curtail the day-work jobs available for residents. Under a broad reading of the words "similarly employed," the Secretary might be empowered to guard against that danger. But if the Secretary intends to limit live-in domestic entries on this ground, it would seem necessary for him to express this policy openly, rather than by basing individual denials on the specious ground that there are available and qualified United States workers when, in fact, there are none.

■ On the present record, we do not decide to what extent the Secretary may subordinate the employer's reasonable needs to the welfare of American labor. Undoubtedly the statute has a major, perhaps even dominant, purpose to pro-

tect American workers (although in *Digilab, supra* at 326, we said that it had both that purpose and the purpose of admitting and absorbing skilled workers from other lands).

■ But whatever can be said about the Secretary's power under part (B) of the statute, we think our review limited to the ground stated by the Secretary— the purported availability of United States workers. That ground, as we have stated, is unsupported in the record, hence the Secretary's finding is arbitrary and capricious, and must be set aside. 5 U.S.C. § 706.

### III

■■ We must also decide whether to affirm the district court's order directing the Secretary to grant certification. The district court was understandably frustrated by the inexcusable failure of the Secretary to comply with its request for a factual explanation. Power to compel agency action is limited, however, to action "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706. Congress has invested the Secretary with very substantial discretion in this area, and while the Secretary's actions to date, based on the reasons he has provided, were arbitrary and capricious, we cannot quite say that they are unlawful or an effort to delay an inevitable result, in the sense that the Secretary could on no conceivable ground decline to certify. *See, e. g., SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). However, time is running out.

■ Accordingly we vacate the district court's judgment insofar as it orders the matter remanded to the Secretary with instructions to grant a certificate. Instead, while ordering that the Secretary's decision be set aside insofar as it holds that there are available United States workers for the task sought to be performed, we direct modification of the Court's judgment so as to remand to the Secretary for further consideration

of Dr. Silva's request in light· of this opinion. Given the unfairness with which the Silvas have been treated to date, we would anticipate prompt certification unless, on sufficient grounds other than the one we have ruled invalid, the Secretary feels compelled to rule that he cannot conscientiously make the requisite certification. Such grounds, if found to exist, should be stated, and their adequacy may be reviewed in the district court.

We would note by addendum that much. of the confusion in this area could be avoided were the Secretary to promulgate suitable regulations with respect to domestic workers, live-in and day, rather than to formulate general policy case-by-case. We can appreciate that there are problems of delicacy in adjusting the needs of United States employers to those of resident workers. But in an area where the Secretary has considerable power under general statutory standards and must decide numerous cases in a routine fashion, the clarification of policy through rules or published pronouncements would protect against arbitrary action. At present the regulations contain nothing material but a flat prohibition against alien domestic workers with less than a year's experience. Until a rule or governing policy is clearly adopted and published with respect to live-ins, prospective employers like the Silvas will expend time and effort seeking to hire an alien, only to be turned down for reasons they could not have anticipated. Thus if, for example, alien live-ins are to be certified to meet only particular needs—such as to work for shut-ins, the elderly, and the like—such policies should be announced.[6] The present case in large measure reflects a lack of coherent announced policies.

*Affirmed in part and remanded to the district court for remand to the Secretary for further proceedings in accordance herewith.*

---

**6.** Nothing herein, of course, is to be construed as passing one way or the other on the validity of any such regulation or policy. Our point is not to suggest here what policies the Secretary should adopt but merely that they should be articulated so as to avoid the sort of injustice and confusion reflected in this case.