PRODUCTION TOOL CORPORATION and Manuel Aguilar, Plaintiffs-Appellants,

v.

EMPLOYMENT AND TRAINING ADMINISTRATION, UNITED STATES DEPARTMENT OF LABOR, Defendant-Appellee.

KENALL MANUFACTURING COMPANY and Blanca Fabian, Plaintiffs-Appellants,

v.

EMPLOYMENT AND TRAINING ADMINISTRATION, UNITED STATES DEPARTMENT OF LABOR, Defendant-Appellee.

Nos. 81–1913, 81–2576.

United States Court of Appeals, Seventh Circuit.

Argued March 30, 1982.

Decided Sept. 20, 1982.

---

Richard J. Puchalski, Chicago, Ill., for plaintiffs-appellants.

Harry L. Sheinfeld, U.S. Dept. of Labor, Dan K. Webb, U.S. Atty., Chicago, Ill., for defendant-appellee.

Before BAUER, Circuit Judge, NICHOLS,* Associate Judge, and WOOD, Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Production Tool Corp. and Kenall Manufacturing Co. appeal from separate orders affirming final decisions of the United States Department of Labor denying their

* The Honorable Philip Nichols, Jr., Associate Judge of the United States Court of Claims, is sitting by designation.

applications for permanent alien labor certifications as provided for by the Immigration and Nationality Act, § 212(a)(14), 8 U.S.C. § 1182(a)(14) (as amended), and the regulations promulgated thereunder, 20 C.F.R. Pt. 656 (1980). Appellants challenge the validity and application of those regulations. For the following reasons, we affirm.

### I

Section 212(a)(14) of the Immigration and Nationality Act, as amended, provides that aliens "seeking to enter the United States, for the purpose of performing skilled or unskilled labor," shall be excluded from admission,

> unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that (A) there are not sufficient workers who are able, willing, qualified . . ., and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.

In 1977, the Secretary of Labor promulgated new regulations setting forth the procedures "whereby such immigrant labor certifications may be applied for, and given or denied." 20 C.F.R. Pt. 656. In applying for certification on behalf of an alien, the employer must submit various documents which show the employer's efforts to fill the job vacancy with a United States worker. *Id.* § 656.21(b). The provision at issue requires documentation which "clearly shows" that:

> (9)(i) The employer has advertised and is still advertising the job opportunity without success in such media as newspapers of general circulation, and ethnic and professional publications;
>
> (ii) The employer's advertising offers prevailing working conditions and requirements and the prevailing wage for the occupation calculated pursuant to

§ 656.40 of this Part, states the rate of pay, offers training if the job opportunity is the type for which the employer customarily provides training, and offers wages, terms and conditions of employment which are no less favorable than those offered to the alien;

> (iii) The employer's advertising describes the job opportunity with particularity; the documentation shall include a copy of at least one advertisement placed by the employer;
>
> (iv) The employer's advertising has produced no satisfactory results.

*Id.* § 656.21(b)(9). The regulations require the certifying officer, in judging whether a United States worker is "willing" to take the job opportunity, to examine the results of the employer's recruitment efforts and to "determine if there are other appropriate sources of workers where the employer should have recruited or might be able to recruit U.S. workers." *Id.* § 656.24(b)(2)(i). Failure by the employer to comply with the application procedures constitutes a separate ground for denying certification. *Id.* § 656.24(b)(1).

If the certifying officer determines that the applicant has not met the requirements of 20 C.F.R. § 656.21 or that there is a United States worker who is "able, willing, qualified, and available" for the job, the officer issues a Notice of Findings setting forth the specific basis for the decision. *Id.* § 656.25. The employer or the alien may then submit rebuttal evidence, which the certifying officer must review. A final determination to grant or deny is then made, and if certification is denied, the employer may request administrative-judicial review by a hearing officer. *Id.* § 656.26.

### II

On May 3, 1977, Production Tool filed an application for labor certification on behalf of its employee Manuel Aguilar. The certifying officer denied that application in part for the stated reason that Production Tool "elected not to comply" with the advertising requirements of 20 C.F.R. § 656.-21(b)(9). The hearing officer affirmed and

the district court denied relief on the same ground. Production Tool admits that it did not comply with that regulation.

On June 13, 1977, Kenall filed an application on behalf of Blanca Fabian. Kenall had advertised the position in the *Reader* at a wage rate of $4.00. The Certifying Officer, after receiving Kenall's rebuttal evidence, denied certification on the ground, *inter alia,* that Kenall's newspaper advertisements did not satisfy 20 C.F.R. § 656.-21(b)(9) because they did not offer the prevailing wage of $4.70 and were not placed in a newspaper of "general circulation." The Hearing Officer affirmed, noting that counsel for Kenall had conceded, and the record showed, that the advertising did not fully comply with the regulations: "This undisputed fact together with the unacceptable advertising in the *Reader* establishes a sufficient basis for affirming the denial." The district court entered summary judgment for appellees.

Production Tool and Kenall contend that the Secretary of Labor was without statutory authority to promulgate the regulations at issue and that, even if authorized, the regulations are invalid because they are inconsistent with the command and purpose of § 212(a)(14). Kenall separately argues that the denial of labor certification constituted an abuse of discretion because 1) it had offered to pay and advertise the prevailing wage and 2) the *Reader,* under Illinois law, is considered a newspaper of general circulation.

### III

The validity of the advertising regulation, according to appellants, turns on the distinction between "legislative" and "interpretive" rules. Appellants assert that the regulation at issue is legislative because it "creates or changes existing rights and obligations" and, as such, "require[s] specific statutory authorization." In both decisions, the district courts found that promulgation of the advertising regulation was a valid exercise of the Secretary of Labor's inherent authority to adopt interpretive rules.

After examining the relevant case law, we believe that the distinction between legislative and interpretive rules is of little, if any, value in determining whether the Secretary must have a specific grant of rule making authority to promulgate the regulation at issue. That distinction nonetheless becomes important when reviewing the regulation to determine whether it constitutes a proper exercise of rule making authority.

■■■ The distinction between legislative and interpretive rules is generally drawn to determine one of two questions: 1) whether the APA's procedural requirements for rule making apply, *see, e.g., Lewis-Mota v. Secretary of Labor,* 469 F.2d 478 (2d Cir. 1972), or 2) whether the rule has the "force and effect of law," *see, e.g., Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1704, 60 L.Ed.2d 208 (1979). Legislative rules are said to have the "force and effect of law"— *i.e.,* they are as binding on the courts as any statute enacted by Congress. *Chrysler,* 441 U.S. at 295, 99 S.Ct. at 1714. "A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner." *Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). Legislative rules are valid so long as they are reasonably related to the purposes of the enabling legislation, *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973), promulgated in compliance with statutory procedures, *Chrysler,* 441 U.S. at 303, 99 S.Ct. at 1718, and not arbitrary or capricious, *Batterton,* 432 U.S. at 426, 97 S.Ct. at 2406. Interpretive rules, in contrast, have only persuasive force. Such rules are entitled to varying degrees of deference or weight, but a reviewing court ordinarily is free to substitute its own view of the relevant statute. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). Section 4 of the Administrative Procedure Act (APA), 5 U.S.C. § 553, subjects proposed rule making to certain procedures designed to afford interested parties notice and an opportunity to comment. "Interpretive rules, general statements of policy or rules of agency or-

ganization, procedure or practice" are exempted from those requirements.

Professor Davis has articulated the test for categorizing a rule as legislative or interpretive as follows:

> [R]ules are legislative when the agency is exercising delegated power to make law through rules, and rules are interpretative when the agency is not exercising such delegated power in issuing them. When an agency has no granted power to make law through rules, the rules it issues are necessarily interpretative; when an agency has such granted power, the rules are interpretative unless it intends to exercise the granted power. The statutory grant of power may be specific and clear, or it may be broad, general, vague, and uncertain.

2 K. Davis, Administrative Law Treatise § 7:10 at 54 (2d ed. 1979) ("Davis"). *See Stoddard Lumber Co. v. Marshall,* 627 F.2d 984, 987 (9th Cir. 1980); *Board of Education v. Harris,* 622 F.2d 599, 613 (2d Cir. 1979), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981). That test recognizes that the terms "legislative" and "interpretive" describe the binding effect of the rule more so than its substance. Appellants' formulation focuses exclusively on the intrinsic character of the rule: whether it changes existing rights and obligations.

■ We agree that if a rule does not affect individual rights and obligations, it will not be treated as a binding, legislative rule. *See Chrysler,* 441 U.S. at 302, 99 S.Ct. at 1717. The converse, however, does not follow: that a rule affecting rights and obligations is *ipso facto* legislative. The rule must also have been promulgated under a delegation of legislative authority. *Id.* at 302–03, 99 S.Ct. at 1717–1718. In the absence of such delegation, the rule is considered interpretive, even though it may affect rights and obligations. The Court in *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), for example, after finding that the rule therein at issue affected individual rights but had not been adopted in compliance with APA procedures, proceeded to analyze the rule as a non-binding interpretive rule. *Id.* at 236–37, 94 S.Ct. at 1074–1075. *See also Energy Reserves Group, Inc. v. Department of Energy,* 589 F.2d 1082, 1094 (Temp. Emer. Ct. App. 1978) ("Even when a rule is legislative in form it will be treated as interpretive unless the administrative agency possesses and exercises delegated legislative authority in issuing it."). Legislative and interpretive rules may share similar substantive traits. Thus those terms may be somewhat misleading. *Compare Batterton, supra* (regulation held legislative where definition of "unemployed" in 42 U.S.C. § 607(a) to be determined "in accordance with standards prescribed by the Secretary") *with Rowan Companies, Inc. v. United States,* 452 U.S. 247, 101 S.Ct. 2288, 68 L.Ed.2d 814 (1981) (regulation defining "wage" in 26 U.S.C. § 3111 held interpretive since Commissioner had not acted under a specific grant of authority). *See generally* 2 Davis § 7:11. An interpretive rule is not, as appellants seem to suggest, nothing more than an internal agency "housekeeping" arrangement, *Energy Consumers & Producers Association v. Department of Energy,* 632 F.2d 129, 139 (Temp. Emer. Ct. App.), *cert. denied,* 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980), and as Professor Davis notes, "many interpretive rules are not really interpretations of anything," 2 Davis § 7:11 at 56. An agency's power to "interpret" a statute is broad and is not limited to defining terms.

■ It is well established that an agency charged with a duty to enforce or administer a statute has inherent authority to issue interpretive rules informing the public of the procedures and standards it intends to apply in exercising its discretion. *See General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); *Georgia v. United States,* 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); *Skidmore, supra;* Davis § 7:8 at 176 (1982 Supp). It is clear that § 212(a)(14) vests the Secretary of Labor with substantial discretion to receive and grant or deny applications for labor certification. *Silva v. Secretary of Labor,* 518 F.2d 301, 310 (1st Cir. 1975). In particular, that provision dele-

gates to the Secretary "the determination of whether the factual circumstances underlying any particular application for certification satisfy the [two] substantive requirements of subsection 212(a)(14). . . ." *Castaneda-Gonzalez v. INS,* 564 F.2d 417, 423 (D.C. Cir. 1977). While the Secretary is charged with the duty to exercise this discretion, the statute does not specify the procedures to be followed or the standards to be applied. Section 212(a)(14) sets forth two substantive requirements—unavailability and lack of adverse effect—but those terms offer little guidance to the certifying officer and prospective applicants. Thus we may reasonably assume that Congress contemplated that the Secretary would issue regulations filling in the essential details. *See Board of Education v. Harris,* 622 F.2d at 613. Indeed, Senator Kennedy, the floor manager and a major proponent of the 1965 amendment to § 212(a)(14), stated on the Senate floor: "there will be cases where the Secretary will be expected to ascertain in some detail the need for the immigrant in this country under the provisions of the law. In any event we would expect the Secretary of Labor to devise workable rules and regulations by which he would carry out his responsibilities under the law without unduly interrupting or delaying immigration to this country." 111 Cong.Rec. 24227 (1965). *See also id.* 21758 ("The bill provides for regulatory discretion which resides with the Secretary of Labor in imposing conditions to keep out immigrants who would take work away. . . .") (remarks of Rep. Celler). Moreover, the court in *Silva* sternly criticized the Secretary for failing to "promulgate suitable regulations": "in an area where the Secretary has considerable power under general statutory standards and must decide numerous cases in a routine fashion, the clarification of policy through rules or published pronouncements would protect against arbitrary action." 518 F.2d at 311. *See also*

*White v. Roughton,* 530 F.2d 750, 752 (7th Cir. 1976); *Environmental Defense Fund, Inc. v. Ruckelshaus,* 439 F.2d 584, 598 (D.C. Cir. 1971). The absence of an express delegation of legislative power does not itself render the advertising regulation void.[1]

▮ Appellants also contend that the advertising regulation shifts the burden of proving unavailability of domestic workers to the employer-applicant. This, they say, is contrary to the intent of Congress and to the greater weight of judicial decisions construing § 212(a)(14). Appellants' argument is not without merit, but we agree with the district court that the regulation constitutes a valid exercise of the Secretary's inherent authority to promulgate rules governing the administration of § 212(a)(14).

▮ The interpretation of a statute by the agency charged with enforcement or administration is entitled to great deference provided it is consistent with the congressional purpose. *Morton,* 415 U.S. at 237, 94 S.Ct. at 1075; *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158 (1971). "[W]e need not find that [the agency's] construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), *quoting Unemployment Commission v. Aragan,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946). "[T]he rulings, interpretations and opinions [of the agency], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore,* 323 U.S. at 140, 65 S.Ct. at 164. Deference is especially appropriate where, as here, the rule was adopted only after all interested persons were given notice and an opportunity to comment pursuant to § 553 procedures. *See Pacific Gas*

---

1. We decide only that promulgation of the advertising requirement was a valid exercise of the Secretary's inherent rule making power. We therefore need not determine whether Congress intended to delegate "legislative" authori-

ty under § 212(a)(14), though other courts apparently have assumed such a grant. *See, e.g., Lewis-Mota v. Secretary of Labor,* 469 F.2d 478 (2d Cir. 1972); *Trimble House Corp. v. Marshall,* 497 F.Supp. 546 (N.D. Ga. 1980).

& Electric Co. v. FPC, 506 F.2d 33, 39 (D.C. Cir. 1974).

Congress enacted § 212(a)(14) to protect the domestic labor force from job competition and adverse working conditions as a result of foreign workers entering the labor market. H. Rep. No. 1365, 82nd Cong., 2d Sess. (1952), *reprinted in* 1952 U.S. Code Cong. & Ad. News 1653, 1705; S. Rep. No. 748, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S. Code Cong. & Ad. News 3328, 3329, 3333–34. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* —— U.S. ——, —— ·, 102 S.Ct. 3260, 3264, 73 L.Ed.2d 995 (1982). The labor market findings the Secretary must make are designed to effectuate that purpose. The 1952 version of § 212(a)(14) provided that aliens will not be permitted to enter to perform work "*if* the Secretary of Labor has determined and certified . . . that (A) sufficient workers in the United States who are able, willing, and qualified *are available* . . . or (B) the employment of such aliens *will* adversely affect the wages and working conditions. . . ." Act of June 27, 1952, ch. 477, § 212(a)(14), 66 Stat. 183 (emphasis added). In 1965 Congress sought to strengthen the protection of United States workers by amending § 212(a)(14) to require exclusion *unless* the Secretary affirmatively finds that there are *not* sufficient domestic workers available and that entry of the foreign worker will *not* adversely affect working conditions. Pub. L. No. 89–236, § 10(a), 79 Stat. 917. As the Senate Report stated, "Under the instant bill, [the present] procedure is substantially changed. The primary responsibility is placed upon the intending immigrant to obtain the Secretary of Labor's clearance prior to issuance of a visa establishing" the two statutory prerequisites. 1965 U.S. Code Cong. & Ad. News 3333–34. *See* H.R. Rep. No. 745, 89th Cong., 1st Sess. 14 (1965). Whereas the 1952 Act opened the door to immigrant workers unless the Secretary acted to exclude them, the 1965 amendment closed that door and placed direct responsibility on the alien to petition the Secretary to open it. *See* 1 C. Gordon & H. Rosenfield, Immi-gration Law & Procedure § 2.40a at 2–290 (1982).

Appellees rely on *Pesikoff v. Secretary of Labor,* 501 F.2d 757 (D.C. Cir.), *cert. denied,* 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974), wherein the D.C. Circuit found that, based on its assessment of the statutory language and legislative history, § 212(a)(14) sets up a presumption that aliens may not enter the United States for permanent employment. *Id.* at 761. Thus the court held:

> if the Secretary's consultation of the general labor market data readily available to him suggests that there is a pool of potential workers available to perform the job which the alien seeks, the burden should be placed on the alien or his putative employer to prove that it is not possible for the employer to find a qualified American worker.

*Id.* To support its conclusion the court cited the language change by the 1965 amendment and Senator Kennedy's remark on the Senate floor that the amendment "places the burden of proving no adverse effect on the applying alien." *Id.* at 762, *citing* 111 Cong. Rec. 24227 (1965).

Judge MacKinnon, in a strong dissent, commented that "[a]lthough this is consistent with the statutory structure, it does present some problems not considered in the majority opinion." *Id.* at 771. He noted that by bearing the "ultimate burden of persuasion," the employer is required to "prove the existence of the nonexistent, a sometimes difficult proposition." *Id.* Instead, he suggested that it would be reasonable and sufficient for the employer to bear the "burden of production" by documenting his efforts to find domestic workers "through newspaper advertisements, employment agencies and the assistance of friends." *Id.* If those efforts are shown to be unsuccessful, "[t]he Secretary then must introduce sufficient competent evidence to overcome that adduced by the employer, failing which certification must issue." *Id.*

As appellants point out, however, *Pesikoff* does not represent the law of this

circuit.[2] Several decisions of this court have held that it constitutes an abuse of discretion to deny labor certification on the basis of evidence which was challenged and not shown to be reliable. *Stenographic Machines, Inc. v. Regional Administrator for Employment & Training,* 577 F.2d 521 (7th Cir. 1978); *Shuk Yee Chan v. Regional Manpower Administrator,* 521 F.2d 592 (7th Cir. 1975); *First Girl, Inc. v. Regional Manpower Administrator,* 499 F.2d 122 (7th Cir. 1974) (per curiam); *Secretary of Labor v. Farino,* 490 F.2d 885, 889 (7th Cir. 1973); *see also Sherwin-Williams Co. v. Regional Manpower Administrator,* 439 F.Supp. 272 (N.D.Ill.1976); *Bitang v. Regional Manpower Administrator,* 351 F.Supp. 1342 (N.D.Ill. 1972). The rationale for this circuit's position, first articulated in *Farino* and later crystalized in *First Girl,* is the basic principle of administrative law that a finding unsupported by reliable record evidence cannot be sustained. Thus, in *First Girl,* we affirmed a decision overturning a denial of certification on the district court's finding that the administrative record contained "no evidence to support defendant's deter-

mination that there was no shortage of applicants qualified, available, and willing to work in the type of employment offered by plaintiff." 499 F.2d at 124, *quoting* 361 F.Supp. 1339, 1340 (N.D. Ill. 1973) (Bauer, J.). The reviewing officer in that case had relied exclusively on raw ISES (Illinois State Employment Service) "availability data" which did not show "that the persons listed were in fact qualified, were still available for employment, or were willing to work for an employer such as plaintiff— as specified in the provisions of 8 U.S.C. § 1182(a)(14)." 361 F.Supp. at 1340. Implicit in this court's reasoning is the premise that labor certification must be granted under § 212(a)(14) unless the Secretary affirmatively determines that able, qualified, and willing United States workers *are* available or that employment of the alien *will* have an adverse effect. Appellants therefore contend that, under the law of this circuit, the burden of proof rests with the Secretary.

While this court has never addressed the statutory basis for that unstated assumption, we need not defend it here,[3] for we

---

**2.** The *Pesikoff* majority acknowledged that certain decisions of the District Court for the Northern District of Illinois, which this court later affirmed or approved, "make a contrary interpretation of the statute." 501 F.2d at 762 n. 9.

**3.** Senator Kennedy's reference to the alien's "burden of proof," to which the *Pesikoff* court attributed great weight, is somewhat ambiguous when viewed in light of his following remark that "there will be cases where the Secretary will be expected to ascertain in some detail the need for the immigrant in this country under the provisions of the law." 111 Cong. Rec. 24227 (1965). The Senate Report also states:

The Department of Labor should have no difficulty in adapting to this new procedure inasmuch as the Department, through its Bureau of Employment Security and affiliated State Employment Service agencies, presently determines availability of domestic workers and the standards of working conditions. There is no apparent need to increase facilities.

[1965] U.S. Code Cong. & Ad. News 3334. "The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history. [Any] statement must be considered with the Reports of both Houses and

the statements of other Congressmen...." *Chrysler Corp.,* 441 U.S. at 311, 99 S.Ct. at 1722. The change in the wording of § 212(a)(14) may be explained, in view of remarks by other Congressmen and even the Senate Report, as a device which would ensure that certification decisions are made "on an individual case basis." *See* 111 Cong. Rec. 21579 (remarks of Rep. Madden); *id.* 21586 (remarks of Rep. Feighan). The problem with the 1952 version was that it was rarely invoked. Gordon, *The Need to Modernize Our Immigration Laws,* San Diego L. Rev. 1, 12 (1975). Thus, the 1965 amendment made it the responsibility of the alien to *seek* certification. *See id.* 21758 (remarks of Rep. Celler); S. Rep., [1965] U.S. Code Cong. & Ad. News 3333·34. But it does not necessarily follow that Congress intended to place the technical burden of proof on the alien. The Secretary's regulations cite 8 U.S.C. § 1361, which states that an alien applying "for a visa or any other documentation required for entry" has the burden of proving that he "is not subject to exclusion under any provision of this chapter." That provision, however, states that proof must be to the satisfaction of the "consular officers" which suggests that "other documentation" does not refer to labor certification. Rather, a labor certification itself would in part satisfy the alien's burden of proof to obtain a visa.

believe that the advertising rule, as written, is not inconsistent with Seventh Circuit precedent. In promulgating 20 C.F.R. § 656.21, the Secretary in effect adopted Judge MacKinnon's position in *Pesikoff.* An applicant-employer does not bear the ultimate burden of persuasion. The regulations require the certifying officer to look to various sources in determining whether a United States worker is available, able, and qualified and whether employment of the alien will have an adverse effect on wages and working conditions. 20 C.F.R. §§ 656.-24(b)(2)(ii) (iv), (b)(3). The documented results of the employer's recruitment efforts are considered only to determine whether a United States worker is *willing* to take the job opportunity. *Id.* § 656.24(b)(2)(1). Even on that inquiry, the certifying officer must also look to the Employment Service Office's recruitment efforts and, presumably, may consider any other sources that may be appropriate. Moreover, the regulations parallel this circuit's position that certification may be denied only upon an affirmative finding of availability and adverse effect. *Id.* § 656.24(b)(2).

We believe that Seventh Circuit precedent does not preclude the imposition of a "burden of production" that is well-defined, very specific, and not unduly burdensome. Rather, documentation of the employer's recruitment efforts will enable the Secretary to make an *informed* decision on the basis of *reliable* evidence. This was our primary concern in *Farino, First Girl,* and later cases. Indeed, the regulations may be viewed as a reaction to strong criticism by this and other circuits of the data upon which determinations had been made and the failure to determine the subsidiary questions of whether the available worker is able, qualified, and willing. In particular, the Secretary has found it a difficult

task to establish that an available worker is "willing." *See, e.g., Ratnayake v. Mack,* 499 F.2d 1207, 1213 (8th Cir. 1974). These regulations seem reasonably designed to gather the most reliable information on that requirement. Finally, by specifying the information to be relied upon in determining whether a worker is willing, the regulations reduce the potential for arbitrariness, a major point of criticism under the prior regulations. *See Silva,* 518 F.2d at 311. *See also Alschuler v. HUD,* 686 F.2d 472, 482 (7th Cir. 1982) (agency must "adopt some adequate institutional means for marshalling the appropriate legislative facts"). Given the strong congressional intent to protect American workers and the statutory duty of the Secretary to determine worker availability and labor conditions, we find the Secretary's advertising regulation to be a reasonable exercise of rule making authority. *Accord, Trimble House Corp. v. Marshall,* 497 F.Supp. 546 (N.D. Ga. 1980).

## IV

■ Having determined the advertising requirement to be a valid rule, it follows that the Secretary must be permitted to give effect to that rule by making substantial compliance[4] a prerequisite to approval of an application. *See Morrison & Morrison, Inc. v. Secretary of Labor,* 626 F.2d 771 (10th Cir. 1980). Production Tool admits that it did not comply.[5] Kenall, however, argues in the alternative that the certifying officer abused his discretion by ruling that the *Reader* is not a newspaper of general circulation.

■ An agency's interpretation of its own regulation is controlling unless "plainly erroneous or inconsistent." *United States*

---

**4.** The current regulations specify that the certifying officer may grant certification if he determines that the employer has committed "harmless error." 20 C.F.R. § 656.24(b)(1) (1981).

**5.** Production Tool further contends that the certifying officer improperly ignored several arguments raised in its rebuttal submission. This contention is utterly devoid of merit. The crit-

ical failure of Production Tool to comply with 20 C.F.R. § 656.21 obviated the need to address its rebuttal point that an "availability" determination should be made on the basis of other data. As previously noted, the employer's recruitment efforts assist the certifying officer in determining whether an available worker is willing, an important subsidiary issue.

*v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *see Ross v. Marshall,* 651 F.2d 846, 849–52 (2d Cir. 1981). We agree with the district court that the certifying officer's construction must stand.

Under the regulations, an employer must advertise the job opportunity "in such media as newspapers of general circulation, and ethnic and professional publications." 20 C.F.R. § 656.21(b)(9)(i). The obvious purpose of that requirement is, as the hearing officer noted, to test adequately the labor market in the area of intended employment. *See id.* §§ 656.24(b)(2)(i), (iv). The statute itself refers to workers who are available "at the place" of the job opportunity. 8 U.S.C. § 1182(a)(14). The hearing officer, however, found Kenall's advertisement deficient under the regulation since the *Reader* is a neighborhood weekly with a circulation of 92,000 in only a limited area of Chicago.

The Tenth Circuit upheld a requirement that a Denver employer advertise in the eastern edition of the *Wall Street Journal* for a foreign investment representative. *Morrison & Morrison,* 626 F.2d at 773–74. In view of the sophisticated nature of the job sought, the court concluded that "[a] requirement that does not involve a significant expenditure of money which is likely to reach the pool of U.S. citizen prospects, is not inconsistent with the law or the regulations promulgated thereunder." *Id.* at 774.

Here, the job opportunity—quality control inspector—is centrally located in the city of Chicago. It is entirely reasonable for the Secretary to require advertisement for such a job to be run in one of the two major Chicago newspapers which circulate in the entire metropolitan area. The Illinois cases Kenall cites define "newspaper of general circulation" only for the purpose of publishing legal notices and have very little bearing on whether a job advertisement in the *Reader* adequately tests the relevant labor market. What constitutes the relevant labor market is a question that falls squarely within the Secretary's realm of

expertise. Thus we are especially hesitant to second-guess that judgment. *See Alschuler,* at 485.

V

Failure on the part of appellants substantially to comply with the Secretary of Labor's valid advertising regulation precluded the certifying officer from being able to determine whether any available United States worker was "willing" to take the job opportunities which appellants sought to fill with alien labor. The decisions of the district courts therefore are AFFIRMED.[6]

---

**6.** Appellants raise other arguments which need not be addressed in view of our holding.