**Irving O. COSBY, et al., Plaintiffs,**

v.

**Sally WARD, et al., Defendants.**

**No. 83C3116.**

United States District Court,
N.D. Illinois, E.D.

Dec. 30, 1985.

620

Jeffrey Gilbert, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs.

Jerry Webb, Asst. Atty. Gen., Martin Lowery, Asst. U.S. Atty., Chicago, Ill., for defendants.

OPINION

EASTERBROOK, Circuit Judge.*

Illinois administers three programs of unemployment compensation. The first

* Of the Seventh Circuit, sitting by designation.

program, regular benefits, affords unemployed people compensation for 26 weeks, unless before then the total payments equal the insured wages during a base period. Illinois pays these benefits out of taxes collected from employers. Ill.Rev. Stat. ch. 48 §§ 300–820 (IUI Act). The second program, extended benefits or EB, becomes available if unemployment in the state exceeds a trigger level. People who have exhausted regular benefits are eligible for extended benefits for up to 13 weeks, if they are available in the state at the time. This program is paid for from state funds, but the federal government reimburses the state for 50% of the cost of this program under § 204 of the Federal-State Extended Unemployment Compensation Act of 1970, 26 U.S.C. § 3304(a)(11) note (EUC Act). The third program, federal supplemental compensation (FSC), is designed for people who have exhausted eligibility for regular and extended benefits. The maximum period of benefits under the FSC program is between 10 and 26 weeks. The FSC program does not require a trigger, and the federal government pays all FSC benefits under the Federal Supplemental Compensation Act of 1982, 26 U.S.C. § 3304(a)(11) note (FSC Act). The federal government also compensates the states for administering the EB and FSC programs. See 42 U.S.C. §§ 501, 502, and 1101(c)(1)(A), and § 604(c) of the FSC Act.

The federal money has strings attached. The state must follow requirements laid down in the federal statutes and the interpretations of these statutes by the Department of Labor. The state has signed a contract with the Department pledging to abide by the rules under the FSC program. One string requires claimants to search for work. People who claim EB must "actively engage in seeking work". EUC Act § 202(a)(3)(A)(ii), IUI Act § 409K(1)(b). This means that they must provide state agencies with "tangible evidence" that they have engaged in "a systematic and sustained effort to obtain work." EUC Act § 202(a)(3)(E)(i) and (ii). The FSC program

uses the same standards. FSC Act § 602(d); IUI Act § 409K(5)(a). None of the statutes defines these terms.

This case is a class action challenging Illinois's administration of the requirement that claimants actively search for work. The plaintiffs are frustrated claimants and putative beneficiaries of the EB and FSC programs. The defendants include the state officials responsible for administering the programs of unemployment compensation, the United States Department of Labor, the Secretary of Labor, and the Assistant Secretary of Labor for Employment and Training. Judge Marshall, to whom this case was initially assigned, certified classes of applicants for EB and FSC benefits. He also concluded that the court has jurisdiction. The defendants have renewed their jurisdictional objections, but the law of the case is otherwise.

The parties stipulated almost all of the important facts. I adopt all of the propositions of fact in the stipulation, which runs more than 80 pages. My opinion abbreviates some of these facts, and to the extent compression produces inaccuracy the stipulation controls. The care with which the parties drafted the stipulation reduced the length of the trial. The plaintiffs presented evidence on October 15 and 16, 1985, concerning the implementation of the search requirement. The defendants' evidence would have consumed another two days, but I stopped the trial under Fed.R. Civ.P. 41(b), which provides that at the close of the plaintiff's case in a bench trial the judge "as trier of the facts may determine them and render judgment against the plaintiff". I gave an oral opinion explaining why the defendants were entitled to judgment. At the same time, however, I called for briefs on the question whether certain interpretive regulations of the Department of Labor bound the State of Illinois. I was prepared to resume the trial, but the briefs did not upset my conclusion. Judgment will be entered for the defendants.

Part I of this opinion summarizes the stipulated facts and contains my findings of fact based on evidence at trial. I have exercised the privilege under Rule 41(b) to find the facts on the basis of the plaintiffs' case. A judge who had heard from the defendants might find the facts differently, but because any change would be in defendants' direction this would not assist the plaintiffs. Part II discusses the plaintiffs' principal contention—that the procedures used in Illinois violate federal law and the implementing letters circulated by the Department of Labor. Part III considers a series of constitutional arguments.

I

1. A person claiming EB or FSC benefits in Illinois is entitled—or condemned, depending on one's perspective—to five levels of review. After a person has exhausted his entitlement to regular benefits, a claims technician at the local office of the Illinois Department of Employment Security (IDES) informs the person of the possible availability of further benefits. The claims technician gives the person a notice, written in English, appropriate to the program in question and explains the meaning of the notice. Many claims technicians are multi-lingual, and each local office has claims technicians who speak the languages of the local population; these technicians will explain the requirements in Spanish or Polish even though the notices are in English. The claims technician supplies each person with forms that must be filled in every two weeks. The person must use the form (the claimant questionnaire) to report what he has done during the last two weeks to find work; the questionnaire also requires answers to questions such as "[w]hat is the lowest starting wage you will accept?" and "[h]ow long (in time) are you willing to travel each way to work?".

If the applicant's questionnaire contains satisfactory answers, and if he otherwise is entitled to benefits (for example, if he has weeks of eligibility remaining), the claims technician sends the claim on for payment. If an answer on the questionnaire raises doubts about eligibility, the technician cir-

cles the answer. Another employee of the local office sends out a form requiring the claimant to appear in person at the local office for a meeting with a claims adjudicator. This notice is supposed to alert the claimant to the problem, but frequently it is filled out in such a perfunctory fashion that the claimant could not know why he had been summoned. (The record does not permit me to determine in what percentage of cases the form is filled out improperly.)

The adjudicator discusses the questionnaire with the claimant, finding out whether the claimant understood the questions and answers. The adjudicator does not coach the claimant on which answers are acceptable and which are not, but as a rule the adjudicator will accept oral retractions of the written answers. If, for example, the claimant says that he will travel 30 minutes each way to work, the adjudicator may discover that the answer represented the claimant's actual travel time to his last job rather than the maximum time the claimant will travel. In that event the adjudicator will find out the real maximum time and use this in his decision. An adjudicator also will allow the claimant to return home to obtain additional documentation, if that should be necessary to prove the number of visits to employers in search of work. At the end of the interview the adjudicator often obtains a brief written statement from the claimant concerning new and significant answers. The adjudicator renders an immediate written decision on the claimant's eligibility for benefits. The reasons are apt to be brief—a handwritten "He unduly restricts his availability under the FSC program: ½ hr travel ea way & $5 hr min wage" (claim of Andres Hernandez) is a typical decision.

A person may appeal an adverse decision of the adjudicator to a referee. Referees are appointed and supervised by people outside the local offices, which ensures that quirks in the local structure do not influence their decisions. Referees are lawyers. Like claims technicians and claims adjudicators, referees receive training on the nature or the program and its eligibility criteria. The training materials of all three include copies of the bulletins circulated by IDES. None of the decision-makers remembers all of these bulletins— no surprise, because the bulletins in the record are hundreds of pages long, and I am confident that the parties have spared me hundreds of pages more on EB, FSC, and the many other programs the IDES administers. All of the technicians, adjudicators, and referees who testified were familiar with the general principles in the bulletins, even if they could not recall seeing a particular bulletin.

The claimant is entitled to file written reasons for the appeal, and the referee meets personally with the claimant. The referee will review the questionnaire with the claimant and again elicit the meaning of the answers. The claimant is entitled to present evidence, and the hearing is recorded. If the referee does not speak the claimant's language, the IDES provides an interpreter. The referee makes a new determination; he is not bound in any way by the adjudicator's findings and decision. The appeal ends in another written decision, typically prepared the day of the interview. This is more formal than the adjudicator's opinion. In the case of Andres Hernandez, the referee's opinion is a little more than a page of single-spaced typing, containing a capsule history of the case, findings of fact, and conclusions. The referee's conclusion was:

Based on the record as a whole, the Referee finds that the Claimant has not made an active, systematic and sustained search for work as required, by the Federal Supplemental Compensation Act. An active, systematic and sustained search for work is shown if: (1.) The Claimant conducts a work search for at least 3 days in a week resulting in at least 5 employer contacts. (2) The Claimant relaxes restrictions with respect to type of work, hours, rate of pay, and travel time and distance, and (3) the Claimant keeps a record of his efforts to find work e.g. indicating the name dates of contact and results. The Claimant failed to comply with (1), (2) and (3) of

the aforementioned requirements. The Claimant failed to keep a credible record of his contacts for the period September 12, 1982 through September 18, 1982. Further there is no evidence to suggest that the Claimant contacted five (5) employers in at least 3 days of the week. The Claimant's forms indicate he was looking for work near his home.

If the referee affirms the denial of benefits, the applicant's next stop is the Board of Review. This is an administrative court within the IDES. The disappointed claimant may file written protests and briefs, personally or by counsel, arguing all legal and factual questions. The Board renders a written decision based on the record made before the referee. In the case of Andres Hernandez, the Board stated the facts and then affirmed on a single ground: "In the case before us, the evidence shows that the claimant conducted his work search on three days of the second week of the period under review. The evidence does not show that the claimant conducted a work search during any other portion of the period under review. Under such circumstances, the claimant's work search was not active, systematic, or sustained as required by The Federal Supplemental Compensation Act." The board's decisions are not systematically published, but IDES maintains for itself and the public a digest of the Board's precedents. There is also a manual of benefits decisions, which contains important decisions of the Board.

A person who is disappointed successively by claims technician, claims adjudicator, referee, and Board may obtain review in the state courts. Ill.Rev.Stat. ch. 48 § 520, ch. 110 § 3–101 et seq. The plaintiffs have not challenged the adequacy of this review. By the time an unemployed person can obtain judicial review, however, the four levels of administrative review will have consumed many months.

IDES has an "Economic Information and Analysis Unit" that collects and disseminates information about labor markets in Illinois. It publishes a monthly newsletter with data on the state as a whole and

selected cities and counties; quarterly publications supply information about smaller areas. But the Unit does not determine whether there are openings in particular occupations, and none of the technicians, adjudicators, and referees who testified made any use of the data disseminated by the Unit.

The technicians, adjudicators, and referees also disregard the work of the Job Service, an agency that helps unemployed people find work. A claimant must register with the Job Service to be eligible for any form of unemployment compensation, and the claimant proposes to the Job Service a plan of search for new work. Counsellors at the Job Service, who should know where there may be openings for a person of the claimant's skills, assist in formulating the plan. But the counsellors at the Job Service do not ensure that plans comply with the work search rules administered by the unemployment offices, the people deciding whether to award benefits do not often see these plans, and compliance with a plan approved by the Job Service will not assure eligibility for EB or FSC benefits.

The adjudicators, referees, and Board all try to determine whether the claimant met the requirement of active search for work during the two weeks covered by the questionnaire. If the person did not, the IDES denies benefits even if it is convinced that the claimant will make an adequate search in a subsequent period. The denial, in turn, triggers a waiting period. Once a person has had a claim for any week rejected, he must find work and earn at least his average weekly benefit for four weeks before he is again eligible for unemployment benefits.

2. The EUC Act and the FSC Act require Illinois to limit EB and FSC benefits to people actively seeking work. The IDES has issued several bulletins to its staff (including the claims technicians, adjudicators, and referees). The principal bulletin concerning the work search requirement of the EB program is Bulletin No. 1467, Supplement No. 1, issued August 20, 1981.

This reproduces § 409 of the IUI Act, which among other things defines "suitable work" for EB purposes as "any work which is within [the claimant's] capabilities", provided that the gross average weekly wage must exceed the higher of the minimum wage and the amount of unemployment benefits to which the claimant would be entitled. The EUC Act requires a "systematic" and "sustained" search; Bulletin No. 1467 defines systematic as an effort "conducted with thoroughness and with a plan or method designed to produce results." It defines sustained as "a continual week-to-week effort maintained for whatever period of time [is] necessary to obtain work. Passive availability for work (merely registering with the Job Service, making telephone calls, looking for want ads, etc.) only without a continued active effort to find work is not sufficient." The Bulletin defines two levels of prospects: "good," meaning that the claimant already has a job on which he is to start (or be recalled to work) within four weeks, and "not good," meaning every other situation. If a person's prospects are "not good," he must accept "[a]ny work which is within [his] physical and mental capabilities" provided that the wage is at least the legal minimum or the amount he could receive as benefits. The Bulletin continues (in section D):

> Due to the EB claimant's prolonged period of unemployment, it is intended that he be required to make a more diligent effort to seek work than would normally be required of an individual receiving regular benefits. Accordingly, the weekly eligibility of each EB claimant must be monitored in light of the special requirements concerning search for work.... All EB claimants must be advised of the work search requirements that they must meet each week.... It is expected that the EB claimant's efforts to find work should increase because of the duration of his unemployment.
> If there are no or few openings in the claimant's customary occupation, he must broaden the types of work sought to meet the active search for work re-

quirement. Claimants who restrict their job search to their customary occupation, or who have other restrictions (i.e., wages, hours, travel, etc.) not based upon physical or mental capability, and by these restrictions fail to maintain an active systematic search for work, may be ineligible for extended benefits.

In determining whether the individual has met the active search for work requirement, where openings in the individual's customary occupation are few or nonexistent, the following areas shall be considered:

a. Available Jobs—Hiring pattern

b. Economic Activity—Labor market

c. Claimant's physical and mental activity

. . . .

The level of economic activity in the labor market area and the kinds of work available are important factors in determining whether a systematic and sustained work seeking effort is being made. Eligibility Review Program and Job Service information and any job counseling interviews as well as the results of aptitude testing would be pertinent.

The requirements of Bulletin No. 1467 are reflected in the form that claims technicians give to all applicants for extended benefits. This form tells claimants, among other things:

> ... You are expected to relax your restrictions with respect to the type of work you will accept, hours, rate of pay, travel time, etc. (for example: A senior accountant would be required to accept work as a junior accountant or bookkeeper, etc.) ... If there are no or few openings in your regular occupation, you are expected to seek any work within your physical and mental capabilities for which you have the background to perform. You must keep a record of your efforts to find work that include the following information:....

You may use your usual methods of contacting potential employers (in-person

contacts, registration with private employment agencies, reporting to your union as required, answering or placing want ads, resumes, telephone calls, etc.,). However, your work search must include some independent work search efforts each week.

If you are not able to conduct an active search for work during a week due to compelling circumstances, you will be held ineligible only if you claim the week. It is your responsibility to inform the local office that you are not claiming a week for this reason.

.... If you do not have a definite prospect of return to work in 4 weeks or less, your job prospect classification is "not good". If your classification is "not good", any work that is within your physical and mental capabilities that you have the background to perform is suitable, provided that ... the gross average weekly wage exceeds your weekly benefit amount (plus any supplemental unemployment benefits paid to you by a former employer)....

If you fail to conduct an active search for work or you refuse to apply for or to accept suitable work ... you will be held ineligible for Extended Benefits for the week in which such failure occurred and for each week thereafter until you have worked in at least 4 weeks with earning in each week, which when totaled, equals at least 4 times your weekly benefit amount.

The EB program has been "off" in Illinois more than it has been "on." When the EB program is "off," or when it is "on" and a claimant's benefits are exhausted, the FSC program is next in line. The principal instructions for the implementation of the FSC program are in Bulletin No. 1519 and its supplements. The original Bulletin No. 1519, dated September 15, 1982, simply states that the FSC program requires the claimant to seek work actively; no subsequent bulletin spells this out, but no bulletin suggests that the requirement has a different meaning than it does under the EB program.

The IDES wrote two notices for claimants under the FSC program. Only the second, which has been used since February 17, 1983, is now important. This handout lays down severe requirements for seeking work:

(1) On each normal working day you must do something positive to find work.

(2) .... You must make work contacts on at least 3 days per week, resulting in at least 5 employer contacts per week. This may mean looking for work beyond your normal commuting distance as well as increasing one-way travel time. You are expected to lower your salary demands, even to the minimum wage, if there are no prospects of finding work in your customary occupation.

(3) If there is any day on which you made no employer contacts, you must indicate on the form what positive effort you made that day to find work, for example, preparing a resume, contacting a union or a professional organization, attending an employment seminar, etc.

(4) If your prospects for obtaining work in your usual occupation are poor (that is, if you do not have a *definite* offer to begin work within four weeks ...), you will be expected to accept any offer of suitable work that is listed with the State Job Service or offered in writing. Any work will be considered suitable if you are reasonably fitted by training and experience to perform the work or if the necessary training is provided when you lack the required skills.

To be suitable, the gross pay of any work offered must exceed your weekly benefit amount plus any Supplemental Unemployment Benefits (SUB) you receive from your former employer, or the State or Federal minimum wage, whichever is greater.

The law provides for the denial of FSC to anyone who does not observe the above requirements. The disqualification will continue until the person has worked in at least four weeks and earned not less than four times his or her weekly benefit amount.

Neither the bulletins nor the notices establish bright-line rules other than the three day—five contract rule in the notice given to FSC claimants and the wage rule that is part of the definition of "suitable" work. A substantial part of the plaintiffs' argument is that the IDES nonetheless used rules of thumb. On the basis of the plaintiffs' evidence, I conclude that the IDES did this. (A caveat, repeated for the last time: defendants' evidence may have put this in a different light.)

Many technicians, adjudicators, and referees testified that they used some rules of thumb. Claims technicians routinely flagged any questionnaire on which the claimant did not answer at least one hour to the question asking for maximum one-way travel time. If the claimant limited his search to day shift work (sometimes even to day and evening shifts), that too was flagged. Any wage significantly over the minimum was flagged, as was any search for employment other than by personal visits to employers' places of business. If subsequent questioning by an adjudicator or referee revealed that the claimant indeed would not travel, say, more than 45 minutes each way to work, or would not work the evening shift, that led to a conclusion that the claimant had not engaged in an adequate search for work.

The adjudicators and referees testified that these rules of thumb were not absolute necessities. For example, if the claimant was seeking work as a lawyer, he would be allowed to use the methods of seeking work customary in the occupation; walk-in visits would not be required. But the witnesses apparently relaxed their presumptive rules but rarely. I have reviewed many of the files contained in the record, and case after case contains notations like those in the Hernandez file—claim denied because of a limitation on travel time such as ½ hour, or a demand for $5 per hour in wages.

The plaintiffs also established that the adjudicators and referees do not go behind the claimants' answers. That is, if the claimant, when asked, said that he would not take a job for less than $5 per hour, the referee would accept that as accurate. There are other ways to determine what wage the claimant demanded. The referee might, for example, look at the applications for employment the claimants filled out, to determine what wage they wrote down. Or if the referee knew that the claimant had applied for a particular job at a particular plant, the referee might find out the wage of that job. Similarly, the referee might find out how long it would take the claimant to reach a particular place at which he had applied for work. Neither adjudicators nor referees pursued such collateral methods of determining the restrictions the claimants placed on their search for work. Some decisionmakers testified that they could figure these matters out from their knowledge of Chicago's geography and labor market, but none testified that he did this regularly.

Finally, the plaintiffs established that the decisionmakers at the IDES do not regularly use any systematic information about the labor market or job openings. They do not know which occupations have "few or no openings"; they do not know anything systematic about levels of economic activity. This is not to say that they know nothing. The decisionmakers testified, and I find, that they could deduce much from the people who come before them. By recalling the occupations of the claimants, they can tell which occupations seem to be producing a lot of unemployment. Similarly, they can tell much about the "prospects" of an applicant, and about conditions in his occupations, by determining how long the applicant has been unemployed. If one steelworker has been unemployed for three weeks this says little; if 10,000 steelworkers have been unemployed for 50 weeks, this says a great deal. The decisionmakers at the IDES see a parade of claimants and can draw astute inferences even though they do not study data prepared by professional students of labor markets.

My finding that the decisionmakers at the IDES do not use any systematic infor-

mation about job openings in particular occupations, or about levels of economic activity, is limited to the kind of cases discussed at trial. The principal use of these data is in evaluating claimants with "good" prospects, who are free to restrict their search for work in certain ways, and people who may have mental or physical restrictions. None of the evidence at trial concerned claimants with "good" prospects or with handicaps of any sort.

The plaintiffs also established that the local offices of the IDES were not entirely consistent in the administration of the programs. Shortly after the beginning of the FSC program the supervisor of one office made it clear that the adjudicators and claims technicians were not to be liberal in granting benefits, and he held a follow-up meeting to drive the point home. Technicians and adjudicators from this office who testified stated that they interpreted the directive as one to hold the claimants to their answers on the questionnaire, to ask no leading questions (that is, not to hint that the questions may have been misunderstood and that other answers may be more helpful), and to apply mechanical rules (such as a minimum travel time of one hour each way). These people also testified, however, that they followed the rules in the IDES bulletins; they complied with their supervisor's wishes by beady-eyed adherence to the rules, an effective bureaucratic technique. Within two months the supervisor at this office reversed field and said that too many claims were being denied; the staff then stopped being so strict. This incident plays no role in my decision. The plaintiffs want injunctive relief. An incident of this character does not inform the appropriate operation of the unemployment system in the future, for any system is open to misunderstanding, overbearing supervisors, and other human foibles. The differences among offices, other than this single incident, are insignificant. Moreover, the referees of the IDES answer to different supervisors, so the claimants at this office could have had de novo review by other officials of the IDES.

3. The United States Department of Labor administers the EUC Act and the FSC Act for the federal government. The statutes do not grant the Department any particular powers, but it must assess state programs to see whether they comply with the statutes (and therefore whether the states should be reimbursed). The EUC Act requires states to enact statutes containing the federal rules; § 409 of the IUI Act complies with that requirement. The FSC Act contemplates contractual arrangements between states and the federal government. Illinois and the Department signed such a contract in September 1982. The state promised among other things to "perform all of the functions and duties ... in accordance with the [FSC] Act as interpreted by the Secretary or the Department of Labor."

The Department has not promulgated any regulations concerning the administration of the two acts. It has offered plenty of advice, however, in the form of "general administration letters" (GALs) and "unemployment insurance program letters" (UIPLs). These documents are addressed to "all state employment security agencies." They are sometimes published in the Federal Register, but they are not regulations because they are not circulated for notice and comment before adoption by the Department. The Department occasionally makes advance copies of the GALs available to state agencies, but this practice apparently is designed to give extra notice rather than to elicit comments. One UIPL in the record expired before its official date of issuance, so the practice of "advance" circulation may be essential. At all events, I conclude that the addressees of the GALs did not have the sort of personal service that would permit the documents to be treated as regulations in the absence of published notice and opportunity for comment. 5 U.S.C. § 553(b).

The most recent missive concerning the FSC program is UIPL 7–84, published at 49 Fed.Reg. 4271 (Feb. 3, 1984). This lays down requirements for each state to follow, and its treatment of the seeking work

requirement is terse. It simply restates the requirement that people actively seek work and provide tangible evidence that they have done so. 49 Fed.Reg. 4275–76. If this is the Department's controlling word, it is no guidance at all. An earlier GAL, however, was more informative. GAL 2–83, issued November 2, 1982, and published at 47 Fed.Reg. 54706 (Dec. 3, 1982), states that the seeking work requirement under the FSC Act is the same as that under the EUC Act. GAL 2–83 ¶ 3 and parts II.C.1.f and II.K.4.b. It refers states to GALs 21–81 and 22–81, which describe the requirements for the EUC Act. The parties have treated GAL 2–83 as the definitive word on the FSC Act, and I shall do likewise.

GALs 21–81 and 22–81 are apparently unpublished. GAL 22–81 is a question-and-answer sheet explaining GAL 21–81. So the only authoritative construction of the seeking work requirement turns out to be GAL 21–81, which was not circulated for advance comment, let alone published. Pages 8–13 of GAL 21–81 describe the requirement in terms similar to those in the IDES's bulletins. Because the text of GAL 21–81 is not published anywhere, I set out the more important language from Part III:

A. *Active Search for Work.* An EB claimant is expected to make a more diligent and active search for work than would normally be required of an individual receiving regular benefits. To meet EB eligibility requirements the claiment's search must be "systematic and sustained." ... [P]assive availability for work is not sufficient....

....

If there are no or few openings in an individual's customary occupation, he/she must broaden the types of work sought to meet the "active" search for work requirement even if the claimant's job prospects are classified as "good." The broadening of types of work sought to include work other than the claimant's highest skill or customary work must be accompanied by a willingness by the claimant to lower his/her wage expecta-

tions. Claiments who restrict their job search to their customary occupation as a mere preference, not based upon physical or mental capability or conditions of the labor market, and by this limitation fail to maintain an active search for work will be ineligible for benefits for failing to actively seek work. In determining whether the individual has met the active search for work requirements, where the openings in an individual's customary occupation are few or nonexistent, the SESA [state employment security agency] shall consider:

a. Available Jobs—hiring patterns

b. Economic Activity—labor market

c. Claimant's Physical and Mental Ability

SESAs must monitor each EB claimant's continuing eligibility in light of the special active search for work requirements. This monitoring can be done effectively through:

—Eligibility Review Interviews

—Development of work search plans specifying actions to be taken by claimants

—Comparison of reported work search contacts with actions specified in work search plan

—Evaluation of adequacy and appropriateness of work search contacts

—Verification of work search requirements

States which either do not now require tangible evidence of an active search for work for each week claimed or which require only employer name, address, and results, should modify procedures to ensure that "tangible evidence" of a "systematic and sustained" work search is provided by the claimant....

....

... SESAs must establish standards based upon their knowledge of the labor market of what constitutes a "systematic and sustained" search for work for the various labor market areas within the State....

....

The amount of effort expended and the number of employer contacts required during a week to demonstrate a "systematic and sustained" effort to find work will vary by labor market areas within a State. The number of employers a claimant is expected to contact to show he/she is actively seeking work depends on many factors, such as the number of employers and employment opportunities in a local area, the geographical size of the local labor market and the availability of transportation.

. . . .

B. *Job Prospects Classification . . . .* When claimants file an initial claim for EB their prospects for obtaining work in their customary occupation shall be considered not good. . . . The SESA should advise each EB claimant whose prospects for reemployment are not good that he/she will be subject to EB suitable work provisions. Under the EB provisions any work which is within the individual's capabilities is considered suitable work.

. . . .

D. *Failure to Apply for or Accept Suitable Work . . . .* If the individual's job prospects have been found to be *not good* and the individual has refused to accept or apply for work suitable under the EB provisions, the EB disqualification would be imposed. Such a disqualification would be subject to the following restrictions:

1. The gross weekly pay for the offered work must exceed the individual's weekly benefit amount, plus any supplemental unemployment benefits (SUB) payable.

2. The job must have been offered to the individual in writing or listed with the SESA.

3. The pay must equal or exceed the higher of the minimum wage under section 6(a)(1), the Fair Labor Standards Act of 1938, or any applicable state or local minimum wage.

These requirements were the basis of the bulletins and notices the IDES issued concerning the EB and FSC programs. Gregory Ramel, who wrote or supervised the preparation of the IDES bulletins, so testified. The plaintiffs nonetheless say that the IDES has not complied with the federal directives, and that these directives preempt the rules the IDES has been using in practice. I turn to that argument.

## II

The plaintiffs' claims are based on differences between GAL 21–81 and the Illinois practice, as I have found the IDES to administer the programs. Illinois uses rules of thumb such as the requirement to contact five employers during three days of the week, the minimum time a person is willing to travel, and the shifts on which the person is willing to work. GAL 21–81 does not suggest the use of all of these mechanical rules, although it does support the requirement that each claimant reduce his wage demand to the greater of the minimum wage or the weekly benefit amount. The GAL talks about "economic activity," "available jobs," and differences in the nature of labor markets; the Illinois bulletin mentions these things, but in practice the decisionmakers do not use them systematically. Finally, GAL 21–81 requires states to notify claimants of the requirements, and the plaintiffs say that the notices the IDES uses are not adequate. The plaintiffs insist that each difference makes the Illinois system defective.

The plaintiffs cast this as a simple preemption argument: the state uses one rule, the federal government requires another, and under the Supremacy Clause the federal rule prevails. Federal regulations, like federal laws, preempt conflicting state laws and practices. *Jones v. Rath Packing Co.*, 430 U.S. 519, 536, 97 S.Ct. 1305, 1315, 51 L.Ed.2d 604 (1977); *Free v. Bland*, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962). But not all pronouncements by federal agencies have the same weight. A regulation carries the force of law only if it implements power delegated to the agency and complies with the notice and comment requirements of the Administrative Proce-

dure Act. *Chrysler Corp. v. Brown,* 441 U.S. 281, 312–16, 99 S.Ct. 1705, 1723–25, 60 L.Ed.2d 208 (1979); cf. *Production Tool Corp. v. Employment & Training Administration,* 688 F.2d 1161, 1166 (7th Cir. 1982). A statement adopted with less formality may be persuasive; interpretive rules announcing the position of the responsible agency about the meaning of a statute should be respected unless plainly mistaken. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 562–70, 100 S.Ct. 790, 795–99, 63 L.Ed.2d 22 (1980); *Industrial Holographics, Inc. v. Donovan,* 722 F.2d 1362, 1366 n. 6 (7th Cir.1983); *Smith v. Miller,* 665 F.2d 172, 179 & n. 7 (7th Cir. 1981); but see *Mayburg v. Secretary of Health and Human Services,* 740 F.2d 100, 105–07 (1st Cir.1984). In the absence of a binding regulation, however, the statute alone is the source of authority, and unless the state's position conflicts with the statute it must be sustained.

■ GAL 21–81 is not a regulation. It has not been published, let alone published for comment in advance of its adoption. It therefore lacks the force of law. Now the plaintiffs say that I am forbidden to reach this conclusion. Until I raised the issue on the eve of trial, all of the parties assumed that GAL 21–81 is a binding regulation, and the pretrial order does not list the status of GAL 21–81 as an issue for decision. The defendants' inattention to the nature of the GAL may have prevented them from raising the issue belatedly, but it does not stop the court from doing so. *Jahnke Construction Co. v. Vulcan Materials Co.,* 527 F.2d 772 (7th Cir.1976). Cf. Fed.R.Civ.P. 16(e); *Syvock v. Milwaukee Boiler Manufacturing Co.,* 665 F.2d 149, 158 (7th Cir.1981); *Sadowski v. Bombardier Ltd.,* 539 F.2d 615, 620–21 (7th Cir. 1976). I have been asked to issue an injunction substantially altering the way Illinois administers the EB and FSC programs. The supposed source of authority for this injunction is GAL 21–81. Because GAL 21–81 is not a regulation, it supplies no authority for anything, and it would be a misuse of the power of the court to direct a state to change its conduct just because

the lawyers for the defendants neglected to inquire into the status of GAL 21–81.

■ GAL 21–81 applies to the EB program, but its rules have been adopted for the FSC program as well, and Illinois has promised by contract to follow the Department of Labor's standards for the FSC program. The contract therefore makes GAL 21–81 a binding construction of the FSC Act between Illinois and the federal government. The plaintiffs seek to take advantage of this contract, but they are not parties to it. Plaintiffs may use the contract only if there is a private right of action in favor of third party beneficiaries to contracts of this sort. No statute creates such a right of action or otherwise grants rights to the plaintiffs, so under cases such as *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), they may not automatically use the contract as a basis of a judicial order against the state.

■ *D'Amato v. Wisconsin Gas Co.,* 760 F.2d 1474 (7th Cir.1985), holds that people claiming rights as third party beneficiaries under a contract between the federal government and some other entity must establish at a minimum that they are the principal beneficiaries of the contract. See also *Holbrook v. Pitt,* 643 F.2d 1261 (7th Cir.1981). People who are simply affected by a contract—"incidental beneficiaries" in the argot—may not use it as the basis of relief against the signatories. Even the intended beneficiary must establish, as in any other case involving implied private rights of action, that Congress meant to make the entitlement enforceable in court. *D'Amato, supra,* 760 F.2d at 1479–80. *D'Amato* held that a handicapped person may not enforce a clause in a contract, required by a federal statute, that requires employers to have affirmative action programs for the handicapped.

■ The plaintiffs try to avoid *D'Amato* by contending that they are the intended beneficiaries of the EB and FSC programs. This was true of the handicapped plaintiff in *D'Amato,* too, but at all events the plain-

tiffs are not especial beneficiaries of GAL 21–81. The plaintiffs may be the intended beneficiaries of the EB and FSC *programs*, but they are certainly not the intended beneficiaries of the *work search requirements*. The two statutes, as well as GAL 21–81, are designed to compel states to tighten up the administration of the unemployment programs, to deny benefits to people whose search for work was sufficient to qualify for regular benefits but not sufficient to qualify for extended benefits. The principles contained in GAL 21–81 are for the benefit of the federal government, which pays 50% of EB and 100% of FSC benefits; the Department of Labor wanted to ensure that states were not too liberal with federal money. The statements in GAL 21–81 are not rules so much as they are grounds on which the federal government may choose to question the states' administration of the program. It is not possible to draw enforceable rights in favor of claimants from the language of GAL 21–81.

 There remains the possibility that GAL 21–81 is a persuasive interpretation of the statutes, which directly preempt the practices now being used in Illinois. The statute requires a "systematic and sustained effort to obtain work" without suggesting that there is only one way to define "systematic and sustained". The GAL does not purport to construe the statutes or to lay down exclusive rules. It is a set of principles telling state agencies to be more restrictive and suggesting what may be restrictive enough. A federal statute preempts state rules only if there is an irreconcilable conflict, and there is a presumption against conflict. E.g., *Jones v. Rath Packing, supra; Hillsborough County v. Automated Medical Laboratories, Inc.,* — U.S. ——, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985); *Metropolitan Life Ins. Co. v. Massachusetts,* — U.S. ——, 105 S.Ct. 2380, 2388–89, 85 L.Ed.2d 728 (1985). The statutes do not define "systematic and sustained;" GAL 21–81 does not give an exclusive definition or preempt any different approaches that may be equally effective in protecting the feder-

al interests. The statutes are, after all, programs of cooperative federalism, and Congress almost always gives the states some leeway in programs of this sort.

The legislative history of the work search clauses does not suggest any rigid requirement. For example, the entire legislative history of the search requirement in the current version of the EUC Act is: "Extended benefits would be denied to any individual for so long as he or she fails to engage in a systematic and sustained effort to obtain work and fails to provide tangible evidence to the State agency that he or she has engaged in such an effort." H.R.Conf.Rep. 96–1479, 96th Cong., 2d Sess. 164 (1980). This just repeats the language of the statute. It does not suggest that the search requirement creates any particular rights—indeed any rights— in favor of claimants.

The Department of Labor apparently is satisfied with the IDES's administration of the EB and FSC programs. It is a defendant, not a plaintiff. It has never suggested that Illinois is out of compliance with the GALs. Although the Department has also never suggested just what GAL 21–81 means, it has taken the position that the GAL does not mean what plaintiffs think it does. Its brief asserts both that each applicant must formulate his own plan for searching and that a state agency need not make written determinations concerning the availability of work. "The logic behind not requiring such a written determination is simple. The fact that an individual has applied for EB or FSC is sufficient reason to believe that there are no or few openings in that individual's customary occupation." This, too, is a position a court must respect. Who knows better than the Department of Labor whether Illinois is in compliance with the Department's GALs? *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).

The Department may not adopt a silly construction of its rules, but it has not

done this. GAL 21–81 requires states to notify claimants of the work search rule; Illinois does this. Claims technicians give notices to the claimants and explain them orally. The notices give adequate warning that the requirements are strict, even though they do not mention each rule of thumb. Illinois insists that claimants expand their search by increasing the distance they will travel and the times they will work, and by reducing the wage they demand. The GAL does not forbid any of these; it probably requires them.

The GAL does not insist that the state take account of labor markets and job openings in any particular way. Take "hiring patterns" as an example. Perhaps the pattern in an industry is to hire those who apply in person for the night shift, and as the employee accumulates seniority he can move to a more favorable shift. A person who applies by telephone rather than in person, or who insists on avoiding the night shift, is not being realistic. He is unemployed by choice, and, because the unemployment system assists only the involuntarily unemployed, the IDES may cut him off. An adjudicator can understand many things about hiring patterns without the benefit of formal, written determinations. The decisionmakers in Illinois use their understanding when acting, and nothing in the GAL suggests that the state must use professionally-developed statistics or written determinations as the sole bases of decisions.

■ To the extent the plaintiffs rely directly on the statutes, rather than on GAL 21–81, they cannot prevail. The statutes require Illinois to tighten the standards; it did; the statutes do not establish how tight is too tight. The state's approach is consistent with the purpose of an enhanced work-search requirement. Regular benefits last 26 weeks. If a person is unemployed at the end of 26 weeks, then (i) there is very little work in the economy the person can do; (ii) the person has not been seriously trying to find a job; or (iii) he has been too picky about what work he will do. The EUC Act and the FSC Act condition

the award of further benefits on the claimants' willingness to look harder and be less choosy. The approach the IDES has adopted follows the path Congress has marked. True it is that this slights the possibility that (i) rather than (ii) or (iii) is the source of the unemployment, but Congress has decided to require people to search harder even if that turns out to be pointless at times.

By the time a person has been unemployed 26 weeks, he ought to be willing to accept a much lower wage, perhaps as low as the legal minimum; Illinois requires this. He ought to be willing to travel farther to work or accept a job at odd hours; Illinois requires this. He ought to contact many employers; Illinois requires this too. Illinois achieves all of these things by bright-line rules, to which the plaintiffs object. But the statutes say nothing about the choice between bright-line rules and other approaches.

Illinois might be in trouble if it applied these rules to people with "good" job prospects or with physical or mental handicaps that made exhaustive searches for work either impossible or exceedingly unlikely to be rewarding. A sensible construction of the statutes would relax the search requirement for such people, and GAL 21–81 suggests as much. Knowledge of job prospects, economic activity, and the labor market would help to tailor a search requirement to the circumstances of these unusual claimants. But none of the evidence in this case concerns people whose prospects are "good" or who have physical or mental handicaps.

The IDES was entitled to require people who have not found work in their own occupations in 26 weeks of searching while on regular benefits to expand their occupational and geographic searches, to increase the number of applications for employment (and for many jobs no application other than a personal one is effective), and to reduce the minimum wages they will accept. The fact that they have not found work in 26 weeks or more is all the infor-

mation about labor markets the state needs in most cases.

The plaintiffs protest that Illinois has taken a blunderbuss approach. Its rules of thumb disregard differences among applicants and occupations. When the decisionmaker accepts the claimant's verbal report about the time he will travel or the wage he will accept, this increases the risk of error. Someone who has in fact sought work a 70–minute commute from home may think erroneously that the time is 45 minutes, and if he reports this as the maximum time he may be disqualified. Someone who answers $7 to the question "what is the lowest wage you will accept?" may mean to say only that $7 is the wage he would like to get; this person may have applied for jobs paying the minimum wage. So there are two sorts of problems in the approach the IDES has taken—the problems associated with categorical rules that may misclassify some applicants, and the problems associated with acting on what the claimants say rather than on what they do. Both are potential sources of error.

Yet the statutes do not proscribe all potential sources of error. Categorical rules are mainstays of the legal system, whether in tax law, see *United States v. Boyle*, —— U.S. ——, 105 S.Ct. 687, 692, 83 L.Ed.2d 622 (1985), or in social welfare programs, see *Heckler v. Campbell*, 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). So is self-reporting. Almost every federal program relies on applicants' answers to questions, and rarely will the agency go behind these answers to see whether the applicant understood the significance of what he said. More often the agency tries to find out whether the applicant answered truthfully, a particular problem in tax and means-tested programs when the applicant has a tendency to share the truth in favor of his financial interests. The IDES, too, rationally could think that a claimant is more likely to overstate the distance he will travel to a job than to understate it.

■ Categorical rules and self-reporting may be essential to the administration of any large scale program. There are hundreds of decisionmakers within the IDES, and unless the disposition of an application for EB or FSC benefits is to turn on the identity of the decider, it is necessary to have some fairly simple rules. The Secretary of Health and Human Services uses categorical rules in administering federal disability programs, and the Supreme Court sustained one set of them in *Heckler v. Campbell, supra*. See also *Stephens v. Heckler*, 766 F.2d 284, 285–86 (7th Cir. 1985); *Garrison v. Heckler*, 765 F.2d 710, 714 (7th Cir.1985). To coordinate the acts of hundreds of decisionmakers there must be rules; rules must have sharp edges to be effective; all rules with sharp edges also create a risk of error. But the IDES is entitled to decide that these errors are less serious, on balance, than the errors that would be created by the unstructured decisions of hundreds of uncoordinated employees.

The IDES has a particularly difficult task because of the cyclical nature of unemployment. The EB and FSC programs become important only when there is substantial, extended unemployment. As the number of unemployed people increases, the IDES must hire more employees to process their claims. These employees must be trained quickly—and they must be trained in several programs, each of which requires difficult decisions. Work search issues are a small fraction of the questions. Did the applicant quit? Was he fired? If he was fired, was that for cause? Did the applicant have enough weeks of covered employment to be eligible? What is the appropriate level of benefits? These and many more confront the staff at the IDES. Several of the issues confront the staff every two weeks. Unlike programs of disability insurance, in which one decision will establish entitlement for an indefinite period, each decision under the unemployment program fixes eligibility for two weeks at best. Most unemployment comes to an end before benefits run out. The claimant must seek work continuously. If he is in the minority that does not find work, then

every two weeks he submits a new form, and the process begins anew.

From 1980 through 1984 the IDES handled 666,309 claims for EB and 414,534 claims for FSC benefits. These are "new claims;" that is, each claim initiates a process entailing many decisions. (Some people created more than one new claim. A person who received FSC benefits after EB ran out would be two "new claims," and if he then got a job, worked for long enough, and once more became unemployed, he could create "new claims" for EB and FSC in turn.) Every claim requires many decisions, at least one every two weeks. And all this is on top of claims for regular benefits.

Like unemployment, the flow of applications is cyclical. In 1983 there were 136,930 new claims for EB and 231,355 new claims for FSC benefits. In 1984, however, there were only 110 new claims for EB and 116,263 new claims for FSC benefits. As the number of claims wound down, the IDES reduced the size of its staff. A significant number of the witnesses at trial, once employed by the IDES, had been laid off; the more prosperous the economy, the fewer unemployment claims adjudicators. It is impossible to see how the IDES could have made bi-weekly decisions concerning the 368,000 new claims for extended benefits in 1983 without self-reporting and rules of thumb. Only by accepting the claimant's answers, for example, could an adjudicator proceed with anything like dispatch. If, for example, the adjudicator had to determine the actual travel time between the claimant's home and each place to which the claimant had applied for work, each adjudication would have consumed an inordinate amount of time. Nothing in the EUC Act, the FSC Act, or the legislative history of either suggests that Congress meant to forbid the use of categorical rules or reliance on claimants' answers.

■ For completeness I add that categorical rules do not violate 42 U.S.C. § 503(a)(3), on which the plaintiffs also rely. This provision, a portion of the Social Security Act, is applicable to unemploy-

ment cases by reference in the EUC Act and the FSC Act. It assures a fair hearing, but this is a matter of procedure rather than of the substantive content of the rules. See *Ross v. Horn*, 598 F.2d 1312, 1318 n. 4 (3d Cir.1979), *cert. denied*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980). Claimants are entitled to two oral hearings, one before the adjudicator and the other before the referee. The second, a de novo inquiry, is recorded and if necessary transcribed. Interpreters are provided if they are necessary. The Supreme Court has allowed other claims subject to this statute to be adjudicated largely on paper, see *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), and the IDES's procedures are more than sufficient.

### III

The constitutional arguments are almost the reverse of the statutory claims. The plaintiffs maintain that Illinois does not have ascertainable standards for the award of benefits. I take this not as a claim that the state lacks standards—after all, the plaintiffs complain loudly about the standards the state uses—but as a claim that the applicants do not have adequate information about the standards. Plaintiffs think that the state should establish a work search plan for each applicant and then simply determine whether the applicant did what he was supposed to do. This would make it unnecessary for applicants to be concerned about the legal principles underlying the definition of an acceptable plan.

■ The plaintiffs may well be right that Illinois should implement this approach as a matter of wise administration, but the Constitution does not require it. The due process clause of the fourteenth amendment, on which plaintiffs rely, certainly does not require the state to inform its residents of all rules of law that may be applicable to them. Even in criminal law, to which the ex post facto and cruel and unusual punishments clauses apply, a state

may insist that residents take the initiative in learning and following the law. See *Rose v. Locke*, 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975); but cf. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 83 L.Ed.2d 758 (1962). A state may not have a body of secret law, see *Carey v. Quern*, 588 F.2d 230, 232 (7th Cir.1978), but the rules IDES uses are not secret. The Board's opinions are digested, and anyone may consult the opinions of the Board and the state courts that sit in review of the Board's decisions. The most the plaintiffs can say is that the rules Illinois uses are complex and shifting. Part of the system of rules is mechanical (the one requiring work contacts at least three days per week, with a minimum of five contacts per week), and part is flexible (the one requiring contacts to be in person unless the customary way of searching for jobs in the occupation is another method).

▮ The state does not give each applicant a compendium of rules, but neither does the state inform each citizen exactly what he must do to avoid being held liable for torts or breaches of contract. Uncertainty is an attribute of any common law system. The bar synthesizes and transmits to those affected the important features of the legal system. No one knows the exact meaning of "negligence;" often a judicial decision many years after the fact will surprise people who relied on earlier cases. Illinois has adopted a system with some of the features of the common law for determining what is an adequate search for work. Any such system takes some people by surprise. The Supreme Court has held, nevertheless, that administrative agencies may use adjudication rather than rulemaking to adopt and alter their rules of decision. *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 49 L.Ed.2d 439 (1974); *NLRB v. Bell Aerospace*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); *CSC v. Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). See also, e.g., *Mosey Mfg. Co. v. NLRB*, 701 F.2d 610 (7th Cir.1983) (en banc). A system of adjudication implies less than perfect notice—and it puts on the applicant the onus of compli-

ance. Social welfare systems may do this, however, and if the applicant cannot show his entitlement to benefits he may be excluded. *Lavine v. Milne*, 424 U.S. 577, 96 S.Ct. 1010, 47 L.Ed.2d 249 (1976); *Dozier v. Loop College*, 776 F.2d 752 (7th Cir.1985).

The plaintiffs rely heavily on *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and the many other cases that require states to give a person notice of the charges against him before they may cut off welfare, disability, and related benefits. Everyone is entitled to know what he has supposedly done wrong, for otherwise he cannot make an intelligent presentation at a hearing. This does not imply, however, that the state must give all applicants a comprehensive notice of the requirements of the program. Again consider the criminal law. A person must receive an indictment or information before being tried, but this does not imply that the state must give everyone a copy of the criminal code (and the judicial decisions interpreting it) before he commits a crime. Quite the contrary, judicial opinions may by themselves be sufficient notice of the effect of a law. *Rose v. Locke, supra.*

Illinois has not left applicants in the dark, however. It both furnishes written notices of the general requirements of the program and supplies oral explanations of the notices. The written notices explicitly warn applicants to expand their search for work and to take any "suitable" work—which the notices define as any work paying more than the minimum wage (or the level of unemployment benefits) within the claimants' physical and mental abilities. The FSC notice explicitly sets out the rule requiring five contacts per week. The EB notice does not, but this does not make it defective. It too suggests a great expansion of search. A diligent claimant does something every day to find work. Even one contact a day will produce compliance. The claimant questionnaire has ten lines to be filled in with job contacts, implying that the IDES wants at least that number for each two weeks. Indeed, given the explicit demand for a thorough search, most claim-

ants should be surprised to find that five contacts a week spread over three days would suffice. Neither notice demands that contacts be "personal," but the decisionmakers testified that this was required only in occupations that traditionally hire by personal application.

The notices contain enough to let the claimants know that they had to make their applications reasonably effective—that is, they had to apply in the way people are hired for the kind of work people without seniority are assigned to do. This should be plain enough to an unemployed person—especially one told by the notice that "suitable" work means *any* work—without a level of detail that might have made the forms even more difficult to comprehend than they are. Those who did not get the picture from the notices could have asked the claims technicians; the technicians who testified said that they answered questions asked of them, and some said that they volunteered information beyond that on the notices.

■ The notice given to those whose benefits are in jeopardy of termination is governed by *Goldberg*, but the IDES uses a form that is supposed to be filled out with a statement of reasons. I found in Part I that this is not always done. One witness even testified that he was instructed by his superior to omit details in order to complete more notices per day. I do not believe, however, that this is a ground for the sort of injunction the plaintiffs seek.

■ First, isolated errors are best dealt with through the administrative tribunals that are in place. An injunction forbidding error in the administration of a social welfare program is not a very useful injunction; error will be with us always. Notice is *already* required. An injunction would not change the governing rule. An injunction may correct a systematic refusal to follow statutory or constitutional commands, but the misguided directives of particular supervisors in some local offices of a large bureaucracy do not require this sort of relief, even if some individual notices do not meet constitutional standards.

Every system of hearings misfires, and it may misfire frequently. The reversal rate in the social security disability system is quite striking, see *Mathews v. Eldridge, supra*, 424 U.S. at 346, 96 S.Ct. at 908, yet the system is nonetheless constitutional.

■ Second, a claimant in Illinois gets two oral hearings, and the deficient notices affect only the first. Even if the claimant does not know why he has been summoned to meet the claims adjudicator, the adjudicator renders a written decision that provides notice of the deficiencies, and the claimant may use this notice in preparing for a hearing before the referee. The referee's hearing is de novo, so the claimant suffers no prejudice; indeed, a dry run before the claims adjudicator may be an excellent form of notice. The two stages of hearings may produce delay, and delay is to be avoided in unemployment cases. *California v. Java*, 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971). The plaintiffs did not introduce data on the average delay between the adjudicator's and the referee's hearings, however, and few claimants' cases reach this stage. Most misunderstandings, even those produced by inadequate notices, are cleared up by the adjudicators, who allow claimants to obtain additional evidence from home if the brief notice impaired their ability to present a case. I therefore conclude that the Illinois system does not produce unacceptable delay. See also *Lavine v. Milne, supra*.

■ The last two constitutional arguments require little discussion. The plaintiffs say that the rules the IDES uses are not rationally related to the purposes of a requirement that claimants actively seek work. The discussion so far in this opinion is sufficient to demonstrate that they are. The plaintiffs also insist that the notices the IDES uses are defective because they are in English, while some people speak other languages (Spanish and Polish were mentioned most often at trial).

Other courts have held that neither the constitution nor the pertinent statute requires notice in any language other than

English. See *Carmona v. Sheffield,* 475 F.2d 738 (7th Cir.1973); *Hernandez v. Department of Labor,* 83 Ill.2d 512, 48 Ill. Dec. 232, 416 N.E.2d 263 (1981). I need not reach the abstract question, however, because the evidence does not demonstrate that any claimant failed to receive effective notice. No claimant testified, and therefore none said that he failed to receive benefits because he did not understand the notice. Claims technicians testified that they gave advice to applicants in whatever language the applicants preferred to speak. Offices of the IDES evidently have employees who speak all of the languages preferred by people who use those offices. The record contains evidence of multi-lingual claims technicians and adjudicators, and the use of interpreters by referees; no one testified that at any office of the IDES there are not enough employees who speak languages other than English.

Indeed, there is not even evidence that a significant number of applicants do not understand English. One claims technician testified that at Local Office 9 she spoke Spanish with 90% of the people who came to her and Polish with another 5%, but she also said that she used whatever language the claimant preferred to speak; she did not try to determine whether particular people were unable to understand English. There was also evidently a selection bias— others in the office sent to this witness claimants who preferred to speak Spanish. Altogether, then, I find that the plaintiffs have not established that any applicant for benefits failed to receive effective notice of the requirements of the EB and FSC programs because of language difficulties. This makes further pursuit of the constitutional question unnecessary. (To the extent the language claim is based on GAL 21–81, which says that written notices "should" be made available in languages other than English, it fails not only because GAL 21–81 does not create legal rights enforceable by claimants but also because this passage is hortatory at best.)

## IV

My rejection of the regulatory, statutory, and constitutional arguments does not imply that Illinois should receive a medal for its administration of the statutes. The record is full of slipshod performances by employees of the IDES. Supervisory employees of the IDES testified that many claims were handled poorly and disagreed with the reasons given by adjudicators and referees. The failure of the IDES to write clearer and more complete notices, and to have them available in Spanish and Polish, is baffling. The state has not explained why it could not better coordinate the work of the Job Service and the unemployment offices—though since I ended the trial before the state put on any evidence, I can hardly blame it for a shortfall of explanation.

The state has no interest in denying benefits to eligible people. The incentive cuts the other way—because EB is 50% and FSC 100% federal funding, the Department of Labor has been worried that states will be too enthusiastic in handing out federal money. This is a principal reason why I have held that GAL 21–81 does not create rights in favor of claimants. The state has no reason to be stingy; administrators of the EB and FSC programs do not need a court to egg them on to greater generosity; that incentive is built in; there are here no discrete and insular minorities in need of help. Why the state has chosen to be so tight-fisted with someone else's money is hard to fathom. It is entitled to be stingy, however. The plaintiffs' remedies lie in administrative and judicial correction of mistakes in particular cases and political correction of the general approach the IDES has taken.

The clerk will enter judgment for the defendants.